**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**
No. 01-31338

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

VERSUS

ISIDRO FRANCISCO SANTIAGO,

Defendant - Appellant.

—————————

Appeal from the United States District Court
For the Western District of Louisiana

—————————

October 17, 2002

Before DeMOSS, STEWART, and DENNIS, Circuit Judges.

DeMOSS, Circuit Judge:

Isidro Francisco Santiago pleaded guilty to count 1 of an indictment charging him with conspiracy to possess with intent to distribute cocaine, reserving the right to appeal the district court's order denying his motion to suppress evidence. Santiago was sentenced to a 50-month term of imprisonment and to a four-year period of supervised release. Santiago now appeals the district court's order denying his motion to suppress.

## BACKGROUND

On August 22, 2000, Louisiana State Police Trooper Ted Raley was conducting safety inspections of commercial vehicles on Interstate 20 in Bossier Parish, Louisiana. Trooper Raley

testified that at some time just prior to 9:00 a.m.,[1] his attention was drawn to a red sport-utility vehicle that was approaching from the west. Raley claims that what drew his attention to the vehicle was a flashing light that emanated from the dash of the vehicle directly below the rear-view mirror. Raley was unable to determine what the source of the light was as the vehicle passed because the vehicle's windows were tinted. Raley, believing that the flashing light posed a hazard to oncoming traffic, decided to pursue the vehicle. Just prior to pulling the vehicle over, Raley testified that he noticed the vehicle was only going 50 miles-per-hour and that the speed limit was 70.[2] Prior to exiting his cruiser, Raley testified that he noticed some "trinkets" hanging from the rear-view mirror.

After pulling the vehicle over, Raley asked the driver, Isidro Santiago, to exit the vehicle. Also present in the car were Santiago's two daughters and a woman, Josefina Vasquez. Trooper Raley asked Santiago for his driver's license and testified that Santiago's hands were shaking when he handed over the license and that he believed Santiago exhibited "extreme nervousness." Raley told Santiago why he had been stopped and was able to identify the object hanging from the mirror as a beaded chain with two golf-ball sized crystal balls hanging from either end. Raley informed Santiago that it is illegal in Louisiana to have objects hanging from a car's rear-view mirror.

---

[1]Though Raley initially testified that he first noticed the vehicle at approximately 7:00 a.m., he later conceded that the traffic stop was logged at 8:53 a.m.

[2]Raley also testified, however, that he believed the vehicle slowed to 50 m.p.h. after he began his pursuit. At no time did Raley believe the vehicle was speeding and Raley made it clear when he testified that his sole purpose for pulling the vehicle over was to investigate the flashing light.

Raley then entered into a brief dialogue with Santiago. Noticing that Santiago had a California driver's license and the vehicle had California plates, Raley testified that he had concerns about whether or not Santiago was trying to travel straight through to his destination as many travelers try to do on such long trips. He therefore asked Santiago why he was driving so slow, referring to the 50 miles-per-hour that Santiago was going. Santiago told Raley that he did not realize he was driving slowly. Raley then asked Santiago where he was going and what he would be doing there. Santiago told Raley that they were heading to Atlanta, Georgia, for one week to vacation before his daughters started back at school. Trooper Raley testified that he found this odd because school had already started in Louisiana but Santiago told him that school did not start until September 6th where they lived.

Trooper Raley asked Santiago whether the car belonged to him, and Santiago said that it was his car. Trooper Raley then asked whether the registration was in the glove box, and Santiago said that it was. Trooper Raley asked who the young woman in the passenger seat was and what her name was. Santiago stated that she was his wife, but hesitated before telling Raley her name. Finally, he pointed his right index finger at Trooper Raley and said "'Josefina.'" Trooper Raley testified that, "it was almost as if he had remembered it suddenly and was glad he did."

Trooper Raley told Santiago to wait by the front of his cruiser as he went to the passenger window of Santiago's vehicle to check the registration and to look at the object hanging from the rear-view mirror. Raley asked the passenger for her driver's license and for the vehicle registration. She stated that Santiago had the registration. Raley stated that Vasquez seemed flustered while she was digging through her purse looking for her license.

3

Her driver's license identified her as Josefina Vasquez, not Josefina Santiago, which led Raley to ask her whether she was Santiago's wife. She stated that she was.

Trooper Raley told Vasquez to remain in the vehicle with the children as he returned to Santiago and told Santiago that Vasquez had stated that Santiago had the registration. Santiago volunteered to go to the vehicle to get the registration. Upon receiving the registration, Trooper Raley noted that the vehicle was registered to Santiago and to another woman, Justina Orochco.

Trooper Raley returned to his cruiser to run checks on the drivers' licenses. Trooper Raley explained that, although Vasquez had stated that they were headed to Atlanta for a vacation, she said they would be in Atlanta for two or three weeks. This statement contradicted Santiago's statement that the family intended to vacation in Atlanta for one week and led Raley to have some "uneasy feelings" about the situation. Raley testified, however, that he had no specific suspicion that Santiago was transporting drugs, though he hadn't ruled out the possibility, but was concerned that the car might be stolen or that the children were abducted, and therefore called for backup. Driver's-license and criminal-history checks were then run on Santiago and Vasquez, but the checks came back negative.

Trooper Raley then walked up to Santiago and asked him who Justina Orochco was, referring to the other name listed on the car's registration. Trooper Raley stated, "it looked almost as if I had hit him over the head with a sledgehammer. His eyes got big and he kind of hesitated and he said, 'That's my other wife.'" Santiago explained that Vasquez was his ex-wife and the mother of his two children. Trooper Raley testified that he found this explanation unconvincing and believed at that point that Santiago

4

and Vasquez were trying to conceal something. Raley testified that he had three main concerns during the stop: 1) that the children may have been abducted; 2) that the car may have been stolen; and 3) that the couple may have been transporting illegal narcotics. Once the criminal history check came back negative, Raley testified that he had satisfied himself that his first two concerns were not a problem, but he was still concerned about the narcotics. Raley stated, "I didn't know - you know, I knew it wasn't a stolen vehicle, I knew it wasn't the children, but I - that leads me on into the narcotics phase or weapons phase."

Trooper Raley told Santiago that he should remove the object from his mirror before leaving, but before he let Santiago go, he told Santiago that a lot of illegal contraband was being smuggled down the interstate highways. Trooper Raley noted that Santiago was from Santa Ana, which was relatively near the border and which he knew to be a major source of methamphetamine, and also noted that Santiago's destination, Atlanta, was known to be a major distribution point of narcotics.

Trooper Raley then asked Santiago whether he had any illegal contraband on his person or in the vehicle. Santiago stated that he did not, and Raley asked Santiago if he minded whether he searched the vehicle to make sure. Santiago stated that he did not mind. Trooper Raley produced a Louisiana-consent-to-search form in Spanish, which Santiago signed after apparently reading it.

Trooper Jeff White then arrived at the scene, and Santiago and Vasquez were frisked for weapons. Trooper Raley told them to stand with the children near his cruiser with Trooper White as he searched the front of the vehicle. Finding nothing in the front, he then opened the rear hatch and immediately noticed that the floor was too high. He also noticed that the plastic molding

5

around the sides had been cut, leading him to believe that there was something beneath the floor.

Trooper Raley removed the molding and attempted to pull up the carpet. The carpet was glued to the floor, which is not typical and Raley concluded that there was a compartment beneath the floor. Trooper Raley then called Trooper Bruce Vanderhoeven, who had a drug dog, and asked him to come to his location. The dog alerted to the inside and outside of the vehicle. The vehicle was taken to state police Troop G headquarters, where a hatch, secured with Bondo, was found in the wheel well. Inside a compartment under the false floor, the troopers found eight to nine packages containing 21 pounds of cocaine.

Santiago pleaded guilty to count 1 of an indictment charging him with conspiracy to possess with intent to distribute cocaine, but reserved the right to appeal the district court's order denying his motion to suppress evidence. Santiago was sentenced to a 50-month term of imprisonment and to a four-year period of supervised release. Santiago now appeals the district court's order denying his motion to suppress.

**DISCUSSION**

Did the initial stop of Santiago's vehicle violate the Fourth Amendment?

Santiago contends that the district court erred by denying his motion to suppress. In reviewing a denial of a motion to suppress, this court reviews the district court's factual findings for clear error and the court's ultimate conclusions on Fourth Amendment issues drawn from those facts *de novo*. **Ornelas v. United States**, 517 U.S. 690, 699 (1996). The court reviews all of the evidence introduced at a suppression hearing in the light most favorable to the prevailing party, in this case the Government. **United States**

6

***v. Orozco***, 191 F.3d 578, 581 (5th Cir. 1999).

Santiago argues that the initial stop of his vehicle violated his right against unreasonable searches and seizures under the Fourth Amendment. "Evidence obtained by the government in violation of a defendant's Fourth Amendment rights may not be used to prove the defendant's guilt at trial." ***United States v. Thomas***, 12 F.3d 1350, 1366 (5th Cir. 1994). The standard for evaluating traffic stops is provided by ***Terry v. Ohio***, 392 U.S. 1 (1968). ***Id.***

In ***Terry***, the Court held that limited searches and seizures are not unreasonable when there is a reasonable and articulable suspicion that a person has committed a crime. 392 U.S. at 21. "Thus, if the detaining officer can 'point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the search and seizure],' the intrusion is lawful." ***Thomas***, 12 F.3d at 1366 (quoting ***Terry***, 392 U.S. at 21); ***United States v. Ibarra-Sanchez***, 199 F.3d 753, 758 (5th Cir. 1999) ("Officers must base their reasonable suspicion on 'specific and articulable facts,' not merely 'inarticulate hunches' of wrongdoing."). "Any analysis of reasonable suspicion is necessarily fact-specific, and factors which by themselves may appear innocent, may in the aggregate rise to the level of reasonable suspicion." ***Ibarra-Sanchez***, 199 F.3d at 759.

The magistrate judge credited Trooper Raley's testimony finding that Trooper Raley had probable cause to investigate whether Santiago's vehicle was in violation of a state statute which prohibits flashing lights except on authorized emergency vehicles.[3] Accordingly, the magistrate judge concluded, the

---

[3] Under LA. REV. STAT. ANN. 32:327(C) (West 2002), "Flashing lights are prohibited except on authorized emergency vehicles, school buses, or on any vehicle as a means of indicating

7

initial stop was supported by probable cause.

We agree with the magistrate's conclusion. Trooper Raley testified that his attention was drawn to Santiago's vehicle because he saw a bright flashing light emitting from the dash area of the vehicle. Trooper Raley characterized the light as brighter than the strobe lights on the top of a police cruiser, "almost like a camera flash." Trooper Raley articulated specific facts supporting a reasonable suspicion that Santiago was in violation of the state statute prohibiting flashing lights in non-emergency vehicles. *See **Ibarra-Sanchez***, 199 F.3d at 758. Therefore, the traffic stop was justified at its inception.

Santiago also contends, however, that Trooper Raley should have permitted him to leave after discovering that Santiago was not in violation of 32:327(c). Trooper Raley testified that he realized at the time he exited his cruiser that there was something hanging from Santiago's rear-view mirror. He stated that he determined that the crystals were the light source when he went to the vehicle to speak with Vasquez. Although the crystals hanging from the mirror did not violate 32:327(c), Trooper Raley stated that he believed they violated another state statute which prohibited drivers from attaching items to their windshield. He also stated that the crystals presented a road hazard to Santiago and to other drivers.

Under LA. REV. STAT. ANN. 32:361.1(B) (West 2002), "no person may operate a motor vehicle with any object or material placed on or affixed to the front windshield or to front side windows of the vehicle so as to obstruct or reduce the driver's clear view through

---

a right or left turn, or the presence of a vehicular traffic hazard requiring unusual care in approaching, overtaking or passing."

the front windshield or front side windows . . . ." Santiago argues that Trooper Raley could not reasonably have believed that the crystals violated the state statute because they did not obstruct or reduce Santiago's clear view.

In *United States v. Zucco*, 71 F.3d 188, 190 (5th Cir. 1995), this Court held that an initial traffic stop was valid because the defendant repeatedly veered onto the shoulder of road, which "arguably was a violation" of a state statute requiring drivers to keep their vehicle within a single lane of traffic. Trooper Raley stated that he understood the statute to prohibit affixing any object to a car's windshield, unless otherwise permitted by law. Although it is doubtful whether Santiago could have been convicted for violating 32:361.1(B) because the object did not obstruct Santiago's vision, Santiago arguably was in violation of the statute. Therefore, Raley was justified in continuing to detain Santiago for violating 32:361.1(B).

<u>Did the detention extend beyond the valid reason for the stop?</u>

Santiago contends that he was detained longer than was reasonably necessary to effectuate the purpose of the stop. A search and seizure must be reasonably related in scope to the circumstances which justified the stop in the first place. *United States v. Valadez*, 267 F.3d 395, 397-98 (5th Cir. 2001); *Terry*, 392 U.S. at 19-20. The officer should use the least intrusive means reasonably available to verify or dispel his or her suspicion in a short period of time. *Valadez*, 267 F.3d at 398.

During a traffic stop, an officer can request a driver's license, insurance papers, and vehicle registration; he or she may also run a computer check and issue a citation. *United States v. Shabazz*, 993 F.2d 431, 437 (5th Cir. 1993). The officer may detain

9

and question the subjects of a traffic stop during the time a computer check is being conducted. *United States v. Dortch*, 199 F.3d 193, 198 (5th Cir. 1999), *opinion corrected on other grounds*, 203 F.3d 883 (5th Cir. 2000). Furthermore, this court usually does not scrutinize the particular questions asked during a stop so long as they tend to relate to the purpose of the stop. *United States v. Machuca-Barrera*, 261 F.3d 425, 433 (5th Cir. 2001); *see also Shabazz*, 993 F.3d at 436 ("[A] police officer's questioning, even on a subject unrelated to the purpose of the stop, is itself [not] a Fourth Amendment violation.").

However, a Fourth Amendment violation occurs when the detention extends beyond the valid reason for the stop. *Dortch*, 199 F.3d at 198. Once a computer check is completed and the officer either issues a citation or determines that no citation should be issued, the detention should end and the driver should be free to leave. *Id.* In order to continue a detention after such a point, the officer must have a reasonable suspicion supported by articulable facts that a crime has been or is being committed. *United States v. Jones*, 234 F.3d 234, 241 (5th Cir. 2000); *see also Valadez*, 267 F.3d at 398 ("[O]nce an officer's suspicions have been verified or dispelled, the detention must end unless there is additional articulable, reasonable, suspicion.").

Trooper Raley stated that he had satisfied himself that the vehicle was not stolen and that the children had not been abducted once the license and registration check came back negative. He stated that, because of Santiago's and Vasquez' nervousness and conflicting statements, he intended to determine whether the vehicle contained narcotics or weapons. He then asked for and was given consent to search the vehicle.

10

Because the traffic stop was valid initially and because a violation of another state statute arguably became apparent after the initial stop, Trooper Raley was permitted to ask for Santiago's license and registration and to run a computer check thereon. *Dortch*, 199 F.3d at 198. Trooper Raley's original justification for the stop ended, however, at the time the computer check was completed. *Id.* at 200. At that point, there was no reasonable or articulable suspicion that Santiago was trafficking in drugs, but Raley nonetheless continued his interrogation after the original justification for the stop had ended. *Id.* at 199-200 (finding that conflicting stories from the driver and passenger about from where they traveled and the fact that neither were listed as authorized drivers on the rental agreement and the driver's nervousness did not give rise to a reasonable suspicion of drug trafficking to support a continued detention after the completion of a computer check); *see also* *Valadez*, 267 F.3d at 396-99 (holding that once the officer determined that the registration sticker and window tint were valid, which were the reasons for the stop, there was no reasonable suspicion to further detain the driver, even to run a computer check for his criminal history); *Jones*, 234 F.3d at 241-42 (finding that discrepancies between the driver and passenger's explanations about their destination and the nature of their business, the fact that the car had been rented by the diver's mother but neither he nor the passenger were listed as authorized drivers, and the driver's admission that he previously had been arrested for crack-cocaine possession did not support a finding of reasonable suspicion of criminal activity). Therefore it was unreasonable for Trooper Raley to continue to detain Santiago after the records check was completed and the extended detention violated Santiago's Fourth Amendment rights.

11

<u>Was Santiago's consent to search valid?</u>

Santiago contends that the district court erred by determining that he voluntarily consented to Trooper Raley's search of the vehicle. "Consent to search may, but does not necessarily, dissipate the taint of a fourth amendment violation." ***United States v. Chavez-Villarreal***, 3 F.3d 124, 127 (5th Cir. 1993). A two-pronged inquiry is used to determine whether consent following a Fourth Amendment violation is valid: (1) whether the consent was voluntarily given, and (2) whether it was an independent act of free will. ***Id.*** Santiago does not contend that his consent to the search was not voluntarily given. Instead, he contends that it was not an independent act of free will.

"Even though voluntarily given, consent does not remove the taint of an illegal detention if it is the product of that detention and not an independent act of free will." ***Chavez-Villarreal***, 3 F.3d at 127-28. "To determine whether the causal chain was broken, [this Court considers]: (1) the temporal proximity of the illegal conduct and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the initial misconduct." ***Id.*** at 128. The Government has the burden of showing admissibility. ***Id.***

Trooper Raley testified that Santiago was being detained on the traffic stop. Trooper Raley testified that, after he completed the records checks, he returned to Santiago and confronted him with the fact that a name other than Vasquez' name was on the vehicle registration. Immediately after Santiago explained the discrepancy, Trooper Raley mentioned the fact that the interstate highway was used for narcotics trafficking and asked for permission to search the vehicle. The record does not reflect that Trooper

12

Raley had returned Santiago's and Vasquez' driver's licenses and the vehicle registration.[4] *See* **Dortch**, 199 F.3d at 202 (noting, similarly, that the fact that an officer had not returned the defendants license and rental papers was a relevant factor as to the voluntariness of the consent). Nor does the record reflect that Trooper Raley had told Santiago that he was free to go. In fact, Trooper Raley testified that he intended to determine whether the vehicle contained contraband.[5] The consent to search, therefore, was contemporaneous with the constitutional violation, and there was no intervening circumstance. **Chavez-Villarreal**, 3 F.3d at 128; **United States v. Hernandez**, 279 F.3d 302, 308-09 (5th Cir. 2002); **United States v. Vega**, 221 F.3d 789, 801-02 (5th Cir. 2000), *cert. denied*, 531 U.S. 1155 (2001); **Dortch**, 199 F.3d at 202-03 (citing the fact that no intervening circumstances occurred between the illegal detention and the consent as a factor in finding that consent was not voluntary). Thus, under the circumstances of this case, the consent to search was not an independent act of free will, but rather a product of the

---

[4] It is unclear from the record whether Trooper Raley handed back the vehicle registration as he testified that he received the registration but also stated that he did not seize the registration. However, there is no evidence in the record that Raley handed back the driver's licenses. Additionally, at oral argument, counsel for both sides were asked whether the licenses were returned and what evidence was in the record indicating such. Neither side could recall the presence of any evidence indicating that the licenses were returned. As we have already stated above, however, the burden was upon the government to show the admissibility of evidence procured by the search, i.e. that the search and seizure were Constitutional and that the consent was voluntary. *Chavez-Villarreal*, 3 F.3d at 127-28.

[5] Raley testified that he had three main concerns: 1) that the children may have been abducted; 2) that the car may have been stolen; and 3) that the couple may have been smuggling illegal narcotics. Raley testified that once the criminal background checks came back negative, he had eliminated his first two concerns, but still believed that he should proceed to ask about narcotics. Raley testified that this was in his mind when he asked Santiago about the other name on the registration, Justina Orochco.

13

unlawfully extended detention.

## CONCLUSION

Having carefully reviewed the record of this case and the parties' respective briefing and for the reasons set forth above, we conclude that the district court erred in denying Santiago's motion to suppress. We therefore **REVERSE** the denial of the suppression motion, **VACATE** the conviction, and **REMAND** with instructions to suppress.