United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 22, 2006**

Charles R. Fulbruge III
Clerk

THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 04-41112

---

UNITED STATES OF AMERICA,

                                     Plaintiff-Appellee,

               versus

PAUL LYNN SCHLIEVE,

                                  Defendant-Appellant.

---

Appeal from the United States District Court
for the Eastern District of Texas
(USDC No. 4:03-CR-84-RAS-22)

---

Before HIGGINBOTHAM, WIENER, and DENNIS, Circuit Judges.

PER CURIAM:[*]

Paul Lynn Schlieve appeals his conviction on federal drug charges. We substitute this opinion for our original[1] and affirm.

I

A

On May 19, 2003, Officer James Edland, an eleven-year veteran of the Pilot Point Police Department, waited near the

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] 2005 WL 3105821 (5th Cir. 2005).

house of Sherry Craver's stepfather to arrest Craver on a federal warrant for conspiracy to manufacture and possess with the intent to distribute methamphetamine.  While waiting for Craver, Edland saw a green Dodge pickup truck pull into the driveway.  About fifteen minutes later, Craver arrived and Edland arrested her before she entered the house.  On her way to jail, Craver stated to Edland that the truck in the driveway belonged to Gary Don Franks.  Edland recalled Whitesboro, Texas police officer David Scott saying earlier that day that Franks had been cooking large batches of drugs.  Upon arriving at the Whitesboro Police Department, Edland contacted Pilot Point officer Joe Morgan and ordered him to observe the house and the truck.

Edland later returned to the house, relieved Morgan, and continued surveillance because he was concerned that Franks would be there with drugs.  The truck left the house around 8:45PM, and Edland followed it.  After observing the truck following too closely, failing to stop at a stop sign, and speeding, he stopped the truck around 8:50.  Officer Morgan arrived a minute or two later.  The defendant, Paul Schlieve, was driving with a passenger, Robbie Reynolds.

Schlieve gave Edland his driver's license and a concealed gun permit.  Edland ordered Schlieve to step out of the truck. Schlieve volunteered that he had a gun in a his pocket and that

2

there were other guns behind the seat of the truck.  Edland took possession of the gun in Schlieve's pocket.  Edland then returned to his car and ran a check on Schlieve's drivers's license, which took about five minutes.  The check revealed no outstanding warrants.[2]

Edland returned to the truck - now about ten minutes into the stop - and asked Schlieve why he was driving the truck. Schlieve told Edland that Franks had asked him to drive his truck to the gas station because it was almost out of gas.  Edland did not believe the story because Schlieve had just passed a gas station.  After realizing that Edland did not believe his story, Schlieve stated that Franks had asked him to pick up the truck because Franks was afraid to leave his house after Craver's arrest.  Schlieve also denied knowing about any drugs in the truck.  Edland and Morgan testified that, during this questioning, Schlieve was nervous, sweating, avoiding eye contact, and stuttering.

About twenty-five minutes after the stop,[3] Edland asked to search the truck.  Schlieve refused consent, after which Edland

---

[2] The evidence does not show that Edland returned Schlieve's license.  This is irrelevant, however, as we assume that Schlieve was in custody throughout the stop.

[3] There is a discrepancy about the timing here.  Officer Edland testified that he spoke to Schlieve for a "couple" of minutes, or "five or ten minutes." From the facts that are undisputed, it appears that he talked to Schlieve for about fifteen minutes, beginning ten minutes into the stop.

told him to wait while he located a K-9 unit.

Because Pilot Point did not have its own K-9 unit, Edland called Denton County around 9:20, but the county was unable to provide one. Edland then called Scott at about 9:25; Scott called fellow Denton Police Officer Junior Torres, who immediately left a softball game some 25 miles away, went home, retrieved his dog, and began driving to the scene. Edland was told that the K-9 unit was on its way. Edland told Schlieve that the K-9 was coming, and Schlieve and Reynolds waited, sitting in a grassy area near the cars.

While waiting, the officers asked Schlieve if they could check the other guns in the truck. Schlieve agreed and removed five pistols and a rifle. Morgan ran checks on these guns starting at about 9:30.[4] It took about twenty minutes to run the checks, which eventually showed that the guns were not stolen.

The K-9 unit arrived around 10:15 or 10:30, about twenty minutes after the gun check was completed. The dog alerted to the truck, and the officers found methamphetamine and a sawed-off shotgun. They arrested Schlieve.

B

An indictment charged Schlieve with possession with intent

---

[4] Schlieve contends that Morgan began running the gun check around 9:15, before calling for the dog. This discrepancy is irrelevant, as we explain later. *See infra* notes 22, 22.

4

to distribute, conspiracy to do the same, use of a firearm during a drug trafficking crime, and possession of an unregistered firearm. Prior to trial, Schlieve moved to suppress the drugs and guns seized during the traffic stop.

During the suppression hearing, Edland testified that he had arrested Craver before she entered her stepfather's house and that he had not heard Schlieve's name before stopping him. He never heard of Schlieve until he called Scott during the stop, when Scott told him that Schlieve was a close associate of Franks.

Morgan testified that he joined Edland of his own volition. Morgan talked to Reynolds, whom he had known previously for his criminal activity. He patted down Reynolds, and Reynolds told him that Schlieve had been trading weapons with the owner of the house.

Scott testified that after Edland called him to request a K-9 unit, it took him about ten minutes to locate Torres. He testified that Schlieve and Franks were "synonymous" because they were good friends and roommates. He had learned about Franks' participation in the methamphetamine cooking conspiracy from another co-conspirator, and he also knew that Franks had been involved in drug trafficking in the past.

Following the hearing, the district court denied the motion

5

to suppress. It estimated that the weapons check ended around 9:52 and that Torres arrived around 10:38, so that the "relevant" time period - "the length of detention beyond the purpose for the initial stop" - was this forty-six minutes. The court found that Edland knew that the truck was owned by Franks, that Franks was involved in manufacturing methamphetamine, that the truck was previously parked at a house where someone had just been arrested for a drug offense, that Schlieve was an associate of Franks, that Schlieve gave conflicting stories, and that Schlieve was nervous. The court concluded that the attempts to obtain a K-9 unit were "likely to quickly confirm or dispel" the suspicions of the police, that the police were diligent in obtaining the K-9 unit, that Schlieve did not feel free to leave during this time period and thus was seized, and that the forty-six minute detention was reasonable.

The jury convicted Schlieve on all four counts. He moved for a new trial, asserting among other things that the Government failed to turn over a second videotape, one from Morgan's car.[5] The district court denied that motion and sentenced him to 160 months imprisonment plus five years of supervised released.

___

[5] Schlieve contends that he did not learn of the alleged second videotape until Morgan testified at trial.

6

Schlieve first contends that the district court erred in denying his motion to suppress the evidence from the traffic stop. When reviewing a ruling on a motion to suppress, we review findings of fact for clear error and findings of law *de novo*.[6]

Schlieve concedes that Edland had the right to stop him in the first place on the basis of his traffic violations, but he maintains that once a check on his license revealed no violations, he should have been ticketed or allowed to leave. He contends that information known to the officer at that time was insufficient to establish reasonable suspicion under *Terry v. Ohio*[7] to support continued detention. He also argues that, even if there was reasonable suspicion at that time, the officers did not act diligently to confirm or dispel that suspicion.

In determining whether a search and seizure is reasonable under *Terry*, the court asks "'whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in

---

[6] *United States v. Shabazz*, 993 F.2d 431, 434 (5th Cir. 1993).

[7] 392 U.S. 1 (1968). *See United States v. Shabazz*, 993 F.2d 431, 434 (5th Cir. 1993) ("[S]earches and seizures of motorists who are merely suspected of criminal activity are to be analyzed under the framework established in *Terry*."). The Government does not argue that Schlieve could not complain about the detention because he did not own the truck; nor could it, under this court's holding in *United States v. Dortch*, 199 F.3d 193, 198 n.4 (5th Cir. 1999).

the first place.'"[8]  "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop."[9]  In *United States v. Brigham*, this court held that a *Terry* stop may last as long as is reasonably necessary to effectuate the purposes of the stop, including the resolution of reasonable suspicion that emerges during the stop.[10]  The government bears the burden of showing the reasonableness of a warrantless search or seizure.[11]

During a traffic stop, once a computer check is completed and the officer either issues a citation or determines that no citation should issue, the detention should end and the vehicle should be free to leave.[12]  In order to continue a detention after this point, further reasonable suspicion must have emerged.[13]  In addition, the length of an unreasonable detention is irrelevant - this court has held that a three-minute delay, *United States v. Jones*,[14] or a delay of "moments," *United States*

---

[8] *Shabazz*, 993 F.2d at 435 (quoting *Terry*, 392 U.S. at 19).

[9] *Florida v. Royer*, 460 U.S. 491, 500 (1983).

[10] 382 F.3d 500, 507 (5th Cir. 2004).

[11] *United States v. Chavis*, 48 F.3d 871, 872 (5th Cir. 1995).

[12] *United States v. Dortch*, 199 F.3d 193, 198 (5th Cir.), *corrected on denial of reh'g*, 203 F.3d 883 (5th Cir. 2000).

[13] *United States v. Jones*, 234 F.3d 234, 241 (5th Cir. 2000).

[14] *Id.*

*v. Dortch,*[15] or a "trivial delay," *United States v. Ellis,*[16] between the completion of the computer check and a later search or dog sniff can be unreasonable.

We must first analyze whether reasonable suspicion existed at the moment after the license check came back clean. At this point, Edland knew that Schlieve had no outstanding warrants; furthermore, because Schlieve had a concealed gun permit, he knew that Schlieve was not an ex-felon.[17] But Edland knew that Schlieve was driving a truck owned by Gary Don Franks, a known, recently active drug dealer. Furthermore, the car had just come from a house where someone was arrested for a drug offense, and the passenger was a known criminal. This is sufficient for reasonable suspicion under *Terry*, and it distinguishes this case from those where we held that unknown people in unknown cars could not be detained after the license check came back clean.[18]

---

[15] *Dortch*, 199 F.3d at 198.

[16] 330 F.3d 677, 681 (5th Cir. 2003).

[17] Under Texas law, ex-felons cannot receive concealed gun permits. And, as this court has held, "firearm ownership is not inherently evil or suspect." *United States v. Emerson*, 270 F.3d 203, 217 (5th Cir. 2002)

[18] *See United States v. Santiagio*, 310 F.3d 336, 340 (5th Cir. 2002) (holding that reasonable suspicion did not exist to detain the defendant after the computer check where, prior to the check, the officer noticed that the defendant was from out of state, that his hands were shaking, and that he and his fellow passengers gave conflicting stories about their travel plans); *Dortch*, 199 F.3d at 200 (same, where prior to the check the defendant was nervous and there was confusion as to the renter of the vehicle and inconsistent answers about travel plans); *Jones*, 234 F.3d at 241 (same, where prior to the check the defendant made inconsistent statements concerning his employment and had a drug-

The later suspicious information - Schlieve's changing stories and nervous behavior and Scott's information about Franks' relationship with Schlieve - was cumulative, so that reasonable suspicion existed throughout the stop.[19]

Our next inquiry is whether the police "diligently pursued a means of investigation likely to quickly confirm or dispel"[20] their reasonable suspicion about Schlieve possessing drugs. Right after the license check came back clean, Edland persistently questioned Schlieve about where he was going and what he was doing.[21] He then asked for consent to search the trunk, and immediately after Schlieve refused,[22] he began his

---

related criminal history).

[19] Schlieve contests this evidence, claiming, for example, that he was not acting nervously, but this is irrelevant to our holding because the evidence is only cumulative.

[20] *United States v. Hare*, 150 F.3d 419, 427 (5th Cir. 1998) (quoting *United States v. Sharpe*, 470 U.S. 675, 683 n.3 (1985)).

[21] Edland was not obligated to call a dog right away; his questioning of Schlieve was a proper means of following up on his reasonable suspicion of drugs, at least initially. The situation is unlike that in *Dortch*, 199 F.3d at 200, where the court upheld the suppression of evidence when the police called for a drug dog 9-10 minutes into the stop, before the computer check came back negative. In *Dortch*, the court explicitly noted that there was never reasonable suspicion of drugs, so that when the computer check came back negative, before the dog arrived, there was no justification for continued detention. The court's dicta suggesting that police suspecting drugs should anticipate needing a drug dog right away is in apropos because the police in that case specialized in drug interdiction, and because the court never stated that probative questioning was an unreasonable means of initially following up on suspicion of drugs.

[22] Even if Schlieve is correct that the officers began the gun check before calling for the dog, the gun check was part of the officers' overall follow-up on their suspicion of drugs. Again, the officers were not obligated to call a dog as soon as they pulled Schlieve over.

10

search for a dog. His first unsuccessful call was promptly followed by his second call to Scott. Scott contacted Torres, who left his softball game at once to retrieve his dog and go to the scene. The police were not dilatory in following up on their suspicions, despite the fact that it was over an hour between the return of the license and the arrival of the dog.

For these reasons, we affirm the district court's denial of the motion to suppress.

### III

Schlieve next argues that the loss or destruction of an alleged second videotape of the stop, which, unlike the tape seen at trial, supposedly contained audio, violated the Jencks Act[23] and *Brady v. Maryland*.[24] Even if this tape existed, and even if it contained a "statement by a witness" under the Jencks Act, in lost or destroyed evidence cases under both the Jencks Act and *Brady*, we perform a sort of harmless error analysis: we "'weigh the degree of negligence or bad faith involved, the importance of the evidence lost, and the evidence of guilt adduced at trial in order to come to a determination that will serve the ends of

---

[23] 18 U.S.C. § 3500 (2000).

[24] 373 U.S. 83 (1963).

11

justice.'"[25]  Employing this test and reviewing the district court's findings of fact for clear error and findings of law *de novo*,[26] we affirm.

Although Schlieve has presented no evidence of bad faith, he argues that the police were at least negligent is losing the alleged tape.  Even if that were so, the "evidence of guilt adduced at trial" was overwhelming and the "importance of the evidence lost" was negligible.  Schlieve does not contend that he would have been acquitted had the alleged second tape been introduced at trial along with the evidence taken from the stop.  Indeed, that seems unlikely given the Government's powerful case.  Rather, he contends that the tape would have been useful in arguing his motion to suppress because it would have helped to establish the time-frame of the stop.  But the officers testified during the suppression hearing as to the timing of events and Schlieve argues that their testimony differed in only one respect from what actually happened.  And, as explained above, that difference is irrelevant.[27]  Moreover, the alleged second tape was unnecessary to clarify the timing of events because the

---

[25] *United States v. Ramirez*, 174 F.3d 584, 589 (5th Cir. 1999) (quoting *United States v. Bryant*, 439 F.2d 642, 653 (D.C. Cir. 1971)); *Johnston v. Pittman*, 731 F.2d 1231, 1234 (5th Cir. 1984).

[26] *United States v. Shabazz*, 993 F.2d 431, 434 (5th Cir. 1993).

[27] *See supra* notes 4, 21, 22.

silent tape was available and had a timer. Schlieve's argument that audio would have helped him to impeach Edland and Morgan during the hearing because it would have shown he was not nervous is immaterial because, as described above, Schlieve's alleged nervousness has no bearing on the relevant *Terry* questions of whether reasonable suspicion existed after the license check came back clean and whether the police diligently followed up on that suspicion.

## IV

Finally, Schlieve argues that the Government denied him due process when it knowingly introduced at trial perjured testimony of Robbie Reynolds, the passenger in the truck. We disagree.

The Government violates a defendant's due process rights when it knowingly uses perjured testimony or allows false testimony to go uncorrected. "To prove a due process violation, the [defendant] must establish that (1) [the witness] testified falsely; (2) the government knew the testimony was false; and (3) the testimony was material."[28] When a defendant does not object to the testimony at trial, this court reviews for plain error,[29] meaning that this court can correct a forfeited error only when

---

[28] *United States v. Mason*, 293 F.3d 826, 828 (5th Cir. 2002) (citing *Giglio v. United States*, 405 U.S. 150 (1972)).

[29] FED. R. CRIM. P. 52(b); *United States v. Johnston*, 127 F.3d 380, 392 (5th Cir. 1997).

13

the appellant establishes: (1) that there is an error; (2) that the error is clear or obvious; and (3) that the error affects his substantial rights.[30] If these factors are established, then the decision to correct the error is within the court's sound discretion, which should not be exercised unless the error seriously affects the fairness, integrity, or public reputation of the judicial proceedings.[31] Because Schlieve did not object to the error at trial, as he concedes, he must meet this stricter standard.

Schlieve argues that the Government knowingly offered perjured testimony on two topics: the drugs in the truck and an alleged statement by Schlieve to Reynolds.

During direct testimony, Reynolds testified that he and Franks had been at the home of Robert Loftice, the house where Craver was arrested. They entered a shed in the backyard which contained evidence of a methamphetamine "cook." Reynolds testified that he saw "a glass jar that had some kind of rock-salt-looking stuff in it." When asked what the substance was, he testified that it was "what they called bones, which is - I guess it's the stuff that's left over after you make methamphetamine." Later, Franks gave Reynolds a bag holding that jar and a small

---

[30] *United States v. Olano*, 507 U.S. 725, 732 (1993).

[31] *Id.* at 736.

baggie.  When Reynolds and Schlieve were in the truck, Reynolds opened the bag and pulled out the jar.  On redirect, the Government asked Reynolds whether Schlieve told him to get out of the truck or get rid of the jar when Reynolds showed him "the container that you know had the bones in it that you know are drugs."  Reynolds testified that Schlieve did not tell him to do so.

Schlieve argues that he had the jar tested after trial and that it contained rock salt, not methamphetamine.  He argues that the Government knew (or should have known) this because it had possession of the jar before and during trial and never tested its contents.  On appeal, the Government does not argue that the jar contained methamphetamine; rather, it argues that the DEA chemist testified at trial that the reddish-brown colored substance in the baggie next to the jar actually contained the bones.  It argues that during closing argument, the Government contended that the baggie contained the bones and only mentioned the jar on rebuttal when the prosecutor reminded the jury that he had asked Reynolds what *he believed* the substance to be.

Schlieve has not shown plain error.  First, there was no plain error because Reynolds' testimony cannot be called

"false."[32] Even if the jar did contain only rock salt (which the Government seems to concede), Reynolds' testimony was only about what he *thought* the jar contained,[33] which is relevant to what Schlieve thought the jar contained. And the Government argued in closing that the baggie contained the bones; it only mentioned the jar in reference to what Reynolds believed.

Second, even if the testimony were "false," there was no plain error because Schlieve has not shown that the Government knew the testimony was false. The Government was, at most, sloppy in its references to the drugs. The transcript does not show that the Government knowingly elicited false testimony or tried to mislead the jury.

Third, there was no plain error because even in the unlikely event that the testimony was *material*, it certainly does not pass the higher threshold of affecting the defendant's "substantial rights" - prejudice - required under plain error analysis. First, the jury was already aware that the jar may not have contained actual drugs because Franks testified that he could not

---

[32] Schlieve argues that this court has held that a due process violation does not require the evidence actually to be false where "the context in which the testimony was invoked, and the argument made by the prosecutor . . . [created] implications that were false." *Barrientes*, 221 F.3d at 753. However, the Government here simply did not create false implications.

[33] Given that Reynolds also testified that Franks had told Loftice that "he had enough in that jar to put him away for the rest of his life," Reynolds' belief seems certainly reasonable.

16

recall what was in the jar but thought it might be coffee filters used to strain the methamphetamine, or maybe rock salt. Second, Schlieve does not complain about Reynolds' and Franks' testimony that Franks told Schlieve that he would be "riding hot" and that there would be "guns and things" in the truck. Neither does he complain about Reynolds' testimony that Schlieve asked Reynolds, after Reynolds pulled the jar out of the bag while they were riding in the car, if there was powder in the bag; in fact, there was powder methamphetamine in the bag, which Schlieve does not dispute. And he does not complain about Franks' testimony that the plan was for Reynolds to grab the bags and run if Schlieve was pulled over by the police, in combination with Reynolds' testimony that when the police began to stop Schlieve, Schlieve asked Reynolds if he was going to run. Given all of this evidence, it seems clear that Reynolds' mistake as to the contents of the jar did not prejudice Schlieve - a jury easily could have concluded that Schlieve had knowledge of the drugs.

Finally, even if there were an error, in no way was it "clear or obvious;" and even if it were clear or obvious, the error did not "seriously affect[] the fairness, integrity, or public reputation of the judicial proceeding[]."[34] Schlieve has

---

[34] *Olano*, 507 U.S. at 732.

shown neither of these two things.

Schlieve also challenges Reynolds' testimony about a statement purportedly made by Schlieve during the "search" of the car by the K-9 unit. During direct examination, the prosecutor asked Reynolds whether he and Schlieve had a conversation after the dog arrived. Reynolds stated that, while sitting together in a ditch, he and Schlieve had wondered if the dog was finding anything; he also admitted previously stating that Schlieve had said at that time that he did not think the officers had found the dope in the truck. On cross-examination, Reynolds testified that they were talking about the dope because both he and Schlieve were aware that there were drugs in the truck.

Schlieve challenges this testimony, which shows his knowledge of the drugs, claiming that Edland's videotape shows that the conversation could not have occurred. Schlieve claims that the videotape shows that he and Reynolds were separated after the K-9 unit arrived, so that he could not have made this comment to Reynolds while the dog was searching the truck. A review of the tape, however, shows that Reynolds and Schlieve are not visible on the tape until after Torres and the dog had already conducted a preliminary examination of the truck, at which time they were separated. Therefore, because their location is not known when the dog first began searching the

18

truck, the videotape does not establish that Reynolds' testimony was false or that the Government knew of its falsity. (And, again, Schlieve cannot show that the testimony substantially affected his rights, or even was material, because of the overwhelming evidence, described above, that Schlieve knew of the drugs in the truck.)

V

For the foregoing reasons, Schlieve's conviction is AFFIRMED.