IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 6, 2007

Charles R. Fulbruge III
Clerk

No. 06-51041

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

JUAN ANTONIO VAZQUEZ

Defendant-Appellant

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:05-CR-500-2

Before BENAVIDES, CLEMENT, and PRADO, Circuit Judges.

PER CURIAM:[*]

Juan Antonio Vazquez ("Appellant") appeals his conditional guilty plea conviction for "Conspiracy to Distribute and Possess With Intent to Distribute Cocaine" in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846. In agreeing to plead guilty, Vazquez reserved the right to appeal the district court's denial of his motion to suppress, which he filed jointly with his co-defendant, Erasmo Perez-Leyva ("Leyva"). Vazquez now appeals the district court's suppression ruling. For the following reasons, we affirm.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

## I. BACKGROUND

At 11:36 a.m. on July 21, 2005, Texas Department of Public Safety ("DPS") Trooper Lucian Ebrom made a traffic stop of a Lincoln automobile, in which Appellant was a passenger and Leyva was the driver.[1] Trooper Ebrom had noticed the vehicle driving on the improved shoulder of Interstate Highway 35, failing to maintain a single lane of traffic, and constituting a hazard to other traffic on the roadway, in violation of sections 545.058 and 545.060 of the Texas Transportation Code.[2]

Once the Lincoln was stopped, Ebrom exited his police car, walked to the rear of the Lincoln, and knocked on the trunk. Prompted by Ebrom, the driver, Leyva, exited the vehicle, and both men proceeded to an area on the shoulder of the highway, near the rear bumper of the vehicle. Ebrom informed Leyva that he had been swerving back and forth on the roadway and asked him if he had been drinking. Leyva answered "no" and immediately volunteered that he was just coming from Laredo. Ebrom then asked Leyva what he was doing in Laredo, and Leyva responded that his brother-in-law (Vazquez) was working down there. Ebrom then asked Leyva for identification, which Leyva produced. As Leyva produced his identification, his right hand was shaking, and Ebrom asked if there was anything wrong and why Leyva was nervous. He again asked whether Leyva had been drinking. By this time, DPS Trooper Fred Ogden, Jr. had arrived at the scene, and Trooper Ebrom asked him to talk to the passenger, Vazquez.

---

[1] The entire stop was visually recorded by a camera mounted in Trooper Ebrom's police car, which was activated when Ebrom turned on his overhead emergency lights to pull over the Lincoln.

[2] Trooper Ebrom testified: "I observed [the vehicle] swerve onto the improved shoulder of the solid white line with both right-side tires. The vehicle then swerved back into its lane and then swerved back across the center stripe and traveled on the center stripe for a short period of time. It repeated this action – I believe in my report at least three times."

At 11:38 a.m., Ebrom asked Leyva how long they were in Laredo, and Leyva responded "three days . . . yeah Friday." Ebrom then questioned how that could be correct since it was already Thursday. Leyva was unable to account for the inconsistency and also stated that the purpose of the trip was to visit his father.

At 11:40 a.m., Ebrom left Leyva and joined Ogden, who was questioning Vazquez. Ebrom opened the driver's side door of the Lincoln and put his head in the car, allegedly to better hear the conversation between Ogden and Appellant. Ebrom and Ogden then conferred and discovered various inconsistencies in Leyva's and Vazquez's stories. Ogden informed Ebrom that Vazquez claimed that the purpose of the Laredo trip was to "drop off his step-daughter" and that they arrived in Laredo the previous day.

At 11:42 a.m., Ebrom returned to Leyva and proceeded to ask him about the Laredo trip. Leyva again stated that they were in Laredo for three days, they stayed at the home of Leyva's sister, and they did not bring anyone else with them to Laredo. When Ebrom continued to ask Leyva about the inconsistency of leaving Friday and only spending three days in Laredo, Leyva changed his previous story and stated that they had left for Laredo on Monday. Ebrom then informed Leyva that he was going to write him a couple of warnings. Ebrom also commented again on the shakiness of Leyva's hands.

Troopers Ebrom and Ogden then re-approached Vazquez at 11:45 a.m. and questioned him further to confirm his version of the itinerary.[3] Vazquez stated that they left for Laredo on Tuesday morning, arrived in Laredo on Wednesday, and stayed the night at a Motel 9 in Laredo.

At 11:47 a.m., Ebrom radioed the dispatcher and requested information on Leyva and Vazquez. After receiving the returns of information from the

---

[3] Trooper Ogden conducted the conversation in Spanish, as Vazquez allegedly did not understand or speak English.

dispatcher, Ebrom and Ogden re-approached Leyva at 11:50 a.m. Ebrom began writing Leyva a warning citation for Leyva's traffic offenses and asked Leyva to look at him without his glasses on.[4] Ebrom then stopped writing the citation and proceeded to question Leyva as to whether he was carrying anything illegal, which Leyva repeatedly denied. At 11:51 a.m., Ebrom asked Leyva for permission to search the vehicle and all its compartments. Leyva responded "go ahead" but also informed Ebrom that the car belonged to Vazquez.

Ebrom and Ogden then approached Vazquez and asked him (in Spanish) whether there was anything illegal in the car, which Vazquez denied. Ogden then asked Vazquez for consent to search the car. Vazquez gave consent and, according to Ogden, did not hesitate in any way.

Ebrom then returned to Leyva and resumed writing the warning. When Ebrom finished, he gave the warning citation to Leyva to sign. Leyva signed and returned the warning with shaking hands. Ebrom again questioned Leyva about his shaking hands.

At 11:55 a.m., Ebrom went to his patrol vehicle and made a radio request for a canine unit. Ebrom and Ogden then patted down Leyva and Vazquez and commenced searching the vehicle at 11:57 a.m. At no time during the search of the vehicle did Leyva or Vazquez seek to withdraw their consent to search nor did they attempt to limit the search in any way. At 12:12 p.m., Ogden located a package of cocaine hidden in the air breather compartment of the engine. Leyva and Vazquez were subsequently handcuffed, placed under arrest, and read their Miranda rights.

## II. STANDARD OF REVIEW

In reviewing a district court's denial of a motion to suppress evidence under the Fourth Amendment, we review findings of fact for clear error and

---

[4] Ebrom testified that he wanted to look at Leyva's eyes to "confirm his story about him not having anything to drink."

conclusions of law de novo. Ornelas v. United States, 517 U.S. 690, 699 (1996). We review the evidence "in the light most favorable to the prevailing party"–in this case the Government. United States v. Santiago, 310 F.3d 336, 340 (5th Cir. 2002).

III. DISCUSSION

A.

We treat routine traffic stops as Terry stops. United States v. Brigham, 382 F.3d 500, 506 (5th Cir. 2004) (en banc). Pursuant to Terry, we employ a two-part test to determine the legality of police investigatory stops. Id. First, we examine "whether the officer's action was justified at its inception." Id. Second, we then inquire "whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." Id. Importantly, a detention "may last no longer than required to effect the purpose of the stop." United States v. Jenson, 462 F.3d 399, 404 (5th Cir. 2006).

As a primary matter, Appellant admits that Trooper Ebrom's initial stop was lawful. Appellant argues, however, that Ebrom's and Ogden's actions and questioning during the traffic stop were not reasonably related to the circumstances that justified the stop–e.g., the traffic violations and suspicions regarding driving while intoxicated–and, therefore, consent to search the vehicle was given at a time when Leyva and Vazquez were illegally detained.

Appellant first contends that the Troopers' questioning regarding Leyva and Appellant's itinerary and travel plans before the initiation of a computer check was impermissible. Ebrom's and Ogden's actions in this regard, however, were plainly proper. An officer may "ask about the purpose and itinerary of a driver's trip during the traffic stop," as such inquiries are "within the scope of investigation attendant to the traffic stop." Brigham, 382 F.3d at 508. An officer may also "undertake similar questioning of the vehicle's occupants to verify the information provided by the driver." Id. (internal quotations omitted).

Furthermore, such questioning can occur before initiation of a computer check. Id. at 511 ("[N]either our prior cases nor any other case law of which we are aware institutes a per se rule requiring an officer immediately to obtain the driver's license and registration information and initiate the relevant background checks before asking questions.").

Ebrom's questioning–from the time questioning began until Trooper Ebrom called dispatch to get information on Leyva and Vazquez–lasted only approximately ten minutes. See id. at 509 (holding that similar questioning for a period of seven minutes before checking registration and identification was permissible).[5]  As in Brigham, these questions undeniably extended the stop a few minutes, but the process "required as long as it did for reasons beyond [Ebrom]'s control"–Leyva and Vazquez's inconsistencies "created suspicion, requiring further detective efforts by [Ebrom]."[6]  Id. at 510.  Thus, Ebrom's actions constituted a "graduated response to emerging facts."[7]  Id. at 509.

---

[5] For reasons explained infra, Trooper Ebrom had reasonable suspicion of other criminal activity before he initiated the computer check–most likely at approximately 11:42 a.m.  At the very least, Ebrom's questions regarding purpose and itinerary for the five minutes between the start of questioning and the development of reasonable suspicion were permissible under Brigham.

[6] Appellant argues that Brigham is distinguishable because the suspicions of the officer in Brigham were aroused immediately by the fact that the driver of the vehicle was not the lessee and that the lessee was not in the vehicle.  The Court, however, stated unequivocally that an officer may "ask about the purpose and itinerary of a driver's trip during the traffic stop." 382 F.3d at 508.  Furthermore, the Court stated that the officer's questions during the seven minutes "effectuated the purpose of the [initial] stop." Id. at 509.  Thus, the officer's initial questioning regarding purpose and itinerary in Brigham was permissible, irrespective of any reasonable suspicion developed during the stop.  This is indistinguishable from the case at hand.

[7] Appellant claims that Ebrom's and Ogden's actions were impermissible because they routinely questioned motorists about their trip's purpose and itinerary–often upwards of ten minutes–regardless of the reason for the stop.  However, as discussed, Ebrom's and Ogden's actions in this case were permissible, and "courts may not scrutinize the motives behind otherwise permissible police actions." Brigham, 382 F.3d at 510 (citing Whren v. United States, 517 U.S. 806, 811-13 (1996)).

Second, Appellant contends that Ebrom's continued interrogation after Leyva's and Appellant's information came back clean from dispatch was impermissible and constituted an unlawful detention. However, long before this point in the traffic stop, Ebrom had reasonable suspicion that "criminal activity may be afoot." Terry v. Ohio, 392 U.S. 1, 30 (1968).

Generally, "once all relevant computer checks have come back clean, there is no more reasonable suspicion, and . . . continued questioning thereafter unconstitutionally prolongs the detention." United States v. Lopez-Moreno, 420 F.3d 420, 431 (5th Cir. 2005). A recognized exception to this general rule is that "if additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed." Id.

In determining whether reasonable suspicion exists in certain circumstances, courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002). In doing so, courts must be careful to allow "officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." Id. (internal quotations omitted).

Here, it is clear that Trooper Ebrom had reasonable suspicion of legal wrongdoing that justified extension of the initial traffic stop. Specifically, the "particularized and objective basis" for reasonable suspicion consisted of: (1) Leyva's nervous demeanor; (2) the glaring and unresolvable inconsistencies in the stories given by Leyva and Vazquez; (3) Leyva's internally inconsistent answers regarding the travel itinerary, including the fact that he changed his story about their date of departure to Laredo; (4) the fact that Leyva and Vazquez were traveling from Laredo, a town on the border of Mexico and the

United States;[8] and (5) the fact that–based on Leyva's erratic driving–Ebrom had reasonable suspicion that Leyva was intoxicated from alcohol or drugs. Thus, even if Ebrom did extend the initial stop by asking Leyva and Vazquez questions after the computer check came back clean, such extension was justified by reasonable suspicion that arose "in the course of the stop and before the initial purpose of the stop ha[d] been fulfilled."[9] Lopez-Moreno, 420 F.3d at 431.

Contrary to the arguments of Appellant, and the fears of the district court, this analysis is not in tension with United States v. Santiago, 310 F.3d 336 (5th Cir. 2002), United States v. Jones, 234 F.3d 234 (5th Cir. 2000), or United States v. Dortch, 199 F.3d 193 (5th Cir. 1999). First, as explained in Brigham, these cases do not prevent an officer from asking a driver and the vehicle's occupants questions about the purpose and itinerary of their trip before initiating a computer check. 382 F.3d at 510. In fact, in Santiago and Jones, the officers "interrogated the drivers and their passengers before initiating the relevant computer checks, and this court did not criticize the order of investigation." Id. at 511 n.12. Second, Santiago, Jones, and Dortch are distinguishable because the Court in these cases determined that no reasonable suspicion existed to prolong the stop after the computer checks came back clean–specifically, the Court in these cases determined that nervousness and inconsistencies in stories

---

[8] This factor is relevant because Mexico is "a common origin of illicit drugs," United States v. Estrada, 459 F.3d 627, 632 (5th Cir. 2006) (internal quotations omitted), and Laredo is a "known source of drugs" for parts of Texas, Ramon v. Texas, No. 05-00-00587-CR, 2001 WL 761809, at *3 (Tex. App. July 9, 2001) (not designated for publication). Cf. United States v. Brignoni-Ponce, 422 U.S. 873, 884-85 (1975) (permitting border patrol agents to consider "the characteristics of the area in which they encounter a vehicle" and the vehicle's "proximity to the border" in determining whether reasonable suspicion exists to stop a vehicle); Estrada, 459 F.3d at 632 (taking into account a vehicle's recent border crossing in determining reasonable suspicion).

[9] Ebrom certainly had such reasonable suspicion before the initiation of the computer check, most likely as early as approximately 11:42 a.m. It was at this point that Ebrom became aware of the glaring and unresolvable inconsistencies between Leyva and Vazquez's stories, and the other factors giving Ebrom reasonable suspicion already existed by this time.

by themselves were not enough to create reasonable suspicion of legal wrongdoing. See Santiago, 310 F.3d at 342 (holding that nervousness and the conflicting statements of the passenger and driver did not constitute reasonable suspicion for the officer to continue his interrogation after the computer checks came back clean); Jones, 234 F.3d at 241-42 (finding that inconsistent answers, contradictory responses, and acknowledgment of a previous arrest on a crack-cocaine charge was not enough to give the officer reasonable suspicion to detain the passenger and driver after the computer check came back clean); Dortch, 199 F.3d at 199 (holding that nervousness, inconsistencies in story, and the defendant's absence as an authorized driver on the rental agreement did not provide reasonable suspicion to prolong the traffic stop after the computer check came back clean). In the case at hand, however, as explained above, there is additional evidence supporting reasonable suspicion—namely that Leyva and Vazquez were coming from a town on the border of the United States and Mexico and that Ebrom had suspicions that Leyva was potentially intoxicated from alcohol or drugs at the time he stopped Leyva.[10] This information, in combination with Leyva's nervousness and the inconsistencies in Leyva and Vazquez's story, was plainly enough to create reasonable suspicion to justify the continued questioning of Leyva and Vazquez after the computer check. See United States v. Rodriguez-Flores, No. 06-60801, 2007 WL 2695623, at *5 (5th Cir. Sept. 11, 2007) (holding that evidence of the defendant's lies regarding his itinerary and arrest record plus the fact that the vehicle had recently crossed the border from Mexico amounted to reasonable suspicion of criminal activity).

---

[10] Although the district court found reasonable suspicion based only on Leyva and Appellant's "conflicting stories" and "Leyva's nervous behavior," a conclusion regarding reasonable suspicion is a question of law, which this Court reviews de novo. See United States v. Jaime, 473 F.3d 178, 181 (5th Cir. 2006) ("To the extent the underlying facts are undisputed we may resolve questions such as probable cause and reasonable suspicion as questions of law."). Thus, this Court's determination that additional facts in the record support a finding of reasonable suspicion is permissible.

Consequently, Ebrom obtained consent to search the vehicle during a time in which Appellant and Leyva were lawfully detained.

B.

Appellant further argues that even if Leyva and Vazquez were not unlawfully detained at the time consent to search was given, the consent was ineffective because it was (1) involuntarily given and (2) not an independent act of free will. We find, however, that consent to search the vehicle was voluntarily given and an independent act of free will for essentially the same reasons stated by the district court.[11]

IV. CONCLUSION

For the foregoing reasons, the ruling of the district court is AFFIRMED.

---

[11] The district court seemingly only analyzed Leyva's consent to search the vehicle. Appellant argues that the troopers did not search the vehicle based on Leyva's consent, but instead relied on Appellant's subsequent consent to do so. Even if Appellant is correct, the analysis with respect to Appellant's consent is essentially the same.