**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

---

No. 91-2911

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

FLOYD COLEMAN,

Defendant-Appellant.

---

Appeal from the United States District Court
For the Southern District of Texas

---

(August 10, 1992)

Before JONES and WIENER, Circuit Judges, and LITTLE, District
Judge[*]

PER CURIAM:

In this criminal appeal, Defendant-Appellant Floyd Coleman
argues that his conviction for the federal crime of carrying and
using a firearm during a drug-trafficking crime, in violation of 18
U.S.C. § 924(c), should be reversed and remanded, with instructions
that evidence seized pursuant to the stop and search of his car be
suppressed. Agreeing with the district court's ruling that the
officers directing the stop of Coleman's car had a reasonable
suspicion that its occupants were engaged in illicit activities, we
affirm. Disagreeing with the district court's determination that

---

[*]District Judge of the Western District of Louisiana,
sitting by designation.

the "plain view" doctrine permitted the patrol officer's seizure of a leather pouch, we nevertheless affirm that court's denial of Coleman's motion to suppress, finding the seizure proper under the principles articulated in Michigan v. Long.[1]

## I.   FACTS AND PROCEEDINGS

### A.   SEARCH AND SEIZURE

In March of 1990, Special Agent Statlander, of the Drug Enforcement Administration (DEA), received information from confidential informants that cocaine and crack were being sold from 4107 West Bellfort, Houston, Texas (Bellfort).  The informants identified Coleman as the "owner and operator" of Bellfort, and Floyd Edwards as the person who ran operations.  Statlander verified that Coleman leased Bellfort, which was used as a private after hours club with a charter in the name of the "Lodge of the Benevolent Order of the Bears."

A confidential informant purchased cocaine at Bellfort on March 4, 1990, as did two undercover officers, in separate transactions, on March 7, 1990.  On March 8, 1990, Statlander observed a yellow Oldsmobile, which he later ascertained was registered to Coleman, parked "outside" Bellfort.  That same day, an undercover officer attempted to purchase two ounces of cocaine from Edwards.  When Edwards was able to provide only one ounce of cocaine, however, the undercover officer left Bellfort.  Police surveillance, which had been established prior to this attempted purchase, was discontinued.  Coleman's car was not at Bellfort at

_____

[1] 463 U.S. 1032, 1049-50 (1983).

the time of this attempted purchase.

About forty minutes later, surveillance was re-established and the undercover officer returned to Bellfort to purchase the negotiated-for two ounces of cocaine. Coleman's car was once again sighted near Bellfort. This time, the undercover officer succeeded in purchasing two ounces of cocaine from Edwards, using $1,700 in marked bills. During this transaction, the undercover officer observed a man sitting at the bar watching her. After the purchase was completed, the undercover officer saw Edwards go to that man and engage him in a brief conversation.[2] When Edwards returned to the undercover officer, he gave her instructions on where she could go to get the cocaine cooked into crack and stated that if she came back she could meet the "other Floyd." After leaving Bellfort, the undercover officer radioed the surveillance team and recounted all that had transpired inside Bellfort. She also told the surveillance team that "there would probably be a couple of people leaving right behind her and the surveillance team should follow those individuals."

After the undercover officer departed Bellfort, Statlander observed two black males leaving, getting into Coleman's car, and proceeding west on West Bellfort, the direction taken by the undercover agent. Statlander testified that because of his surveillance position he was unable to identify these individuals.

---

[2]The government states that the undercover officer saw "the appellant" sitting at the bar. There is no evidence, however, the undercover officer knew that this man was Coleman at that time.

3

Statlander and Officer Ollie, of the Houston Police Department Narcotics Squad, followed Coleman's car for some distance and then requested a marked unit stop the car to "identify" its occupants.

Officers Pedraza and Smith, in separate patrol cars, responded to Statlander's request. The officers spotted Coleman's car in the 7800 block of West Bellfort and followed it to the 8200 block of West Bellfort, where Smith pulled it over. Coleman immediately got out and met Smith at the rear of his (Coleman's) car. Observing "two bulges in Coleman's pockets," Smith frisked Coleman for weapons, and discovered two bundles of money. (Coleman does not challenge this frisk.)

The patrol officers and Coleman have quite different versions of what transpired next. The district court accepted the officers' version in toto. According to the officers, when asked for identification, Coleman replied that his driver's license was in the car. Pedraza inquired as to its precise location; and Coleman responded that it was inside a "pouch." Apparently intending to get the pouch, Coleman moved toward the car, but was stopped by Pedraza, who retrieved the pouch himself from underneath the driver's seat armrest. Pedraza testified that when he picked up the pouch he could feel a gun in it. Nevertheless, without first removing the gun, Pedraza handed Coleman the pouch. Coleman started to unzip the pouch but then gave it back to Pedraza, telling him there was a gun in it. Pedraza looked in the pouch and found a loaded handgun and Coleman's driver's license, as antici-pated, as well as several beepers, and a telephone book. Coleman

4

thereupon was arrested for possession of the gun in violation of Texas law. Ollie and Statlander, who had by this time been called to the scene, checked the bundles of money seized from Coleman and discovered that one bundle contained the $1,700 in marked bills used by the undercover officer to purchase the two ounces of cocaine. Ollie advised Coleman of his Miranda rights, and asked for, and received, Coleman's written consent to search the vehicle. On the front seat, under the console armrest between the driver and passenger seats, Ollie found a brown paper bag containing cocaine and crack.

Coleman, on the other hand, testified that he was carrying his driver's license and other papers in his sock because his jogging suit had no pockets. So, when Smith asked for Coleman's driver's license, he produced it. Pedraza then arrived and asked Thomas Braxton, the passenger in the car, who owned the pouch that was in the car. When Coleman responded that it was his, Pedraza "removed it from the back seat and said there was a pistol in it." At this point, Coleman was arrested, and the officers searched the entire car. According to Coleman, Statlander had not arrived on the scene at the time of the car search. Moreover, Coleman states that Ollie asked for and received his written consent to search the car only after it had already been searched.

B.  DISTRICT COURT'S RULING

Coleman filed a motion to suppress the firearm, money, and cocaine seized from his car, asserting that the stop and

5

warrantless search of his car was unreasonable, and thus violative of the Fourth Amendment of the United States Constitution. After a hearing on this motion, the district court ruled that the temporary detention of Coleman's car was a valid investigatory stop as the circumstances of the departure of Coleman's car gave rise to a reasonable suspicion that met the minimal level of justification necessary for the stop. Neither was a warrant required to seize the pouch from under the driver's armrest, the district court ruled, because it was in "plain view." Lastly, the court upheld the search of the entire car, in which the officers discovered the brown paper bag containing cocaine and crack, as either a search incident to a valid arrest or pursuant to Coleman's voluntary and knowing consent.

Coleman pleaded guilty to multiple narcotics trafficking charges,[3] and entered a conditional guilty plea to using and carrying a firearm during a drug-related offense, in violation of 18 U.S.C. § 924(c). Before this court, Coleman challenges only his conviction on the firearms count.

## II. ANALYSIS

### A. STANDARD OF REVIEW

While this court reviews questions of law de novo, "[i]n

---

[3]Coleman pleaded guilty unconditionally to conspiring to distribute, manufacture, and possess with intent to distribute cocaine and cocaine base, in violation of 21 U.S.C. § 846; two counts of possessing with intent to distribute and distribution of cocaine base, in violation of 21 U.S.C. § 841(a)(1); knowingly opening and maintaining a place to distribute a controlled substance, in violation of 21 U.S.C. § 856.

6

reviewing a trial court's ruling on a motion to suppress based on live testimony at a suppression hearing, the trial court's purely factual findings must be accepted unless clearly erroneous, or influenced by an incorrect view of the law, and the evidence must be viewed [in the light] most favorable to the party prevailing below."[4]

B.  STOP OF COLEMAN'S CAR

Absent probable cause, a vehicle and its occupants nevertheless may be briefly detained for investigation based on the lesser standard of reasonable suspicion of criminal activities.[5] Under Terry v. Ohio, a seizure and search is deemed reasonable if it "was justified at its inception," and "reasonably related in scope to the circumstances which justified the interference in the first place."[6]  "[R]easonable suspicion is to be determined by considering the totality of the circumstances, including the collective knowledge of all officers in assessing the facts."[7] Issues concerning the legality of a search of a car, which takes place after an investigatory stop, are separate from whether the

_____

[4]U.S. v. Muniz-Melchor, 894 F.2d 1430, 1433-34 (5th Cir. 1990), quoting U.S. v. Maldonado, 735 F.2d 809, 814 (5th Cir. 1984).

[5]Terry v. Ohio, 392 U.S. 1, 21-22 (1968).

[6]Id. at 19-20.

[7]U.S. v. Shaw, 701 F.2d 367, 377 n. 4 (5th Cir. 1983) (internal quotations omitted), citing U.S. v. Cimino, 631 F.2d 57, 59 (5th Cir. 1980), and U.S. v. Kreimes, 649 F.2d 1185, 1189 (5th Cir. 1981).

7

stop itself was legal.[8]

Coleman offers two somewhat inconsistent reasons why the officers did not have a reasonable suspicion that he was involved in drug activities, and thus no legitimate reason to stop his car. Coleman first argues that there was no legitimate investigatory reason to "identify" the car's occupants because Statlander had seen him previously and therefore knew what he looked like, had checked the car's registration and knew it belonged to Coleman, and had already targeted him for investigation. Thus, Coleman contends, Statlander and Ollie already knew he was in the car when they directed that it be stopped by the marked units for the ostensible purposes of identifying its occupants. Alternatively, Coleman maintains that the officers' collective knowledge would not justify the stop because "[a] drug transaction occurred in a club between Floyd Edwards and an undercover officer, and he was neither involved in the transaction nor identified as being present."

The government responds that at the time Statlander and Ollie requested the yellow Oldsmobile be stopped they had much more than an "inchoate and unparticularized suspicion or hunch" that Coleman and the yellow Oldsmobile were involved in drug activities. Specifically, when Statlander requested that a marked unit stop the car he knew that Bellfort was leased by Coleman; Bellfort was a distribution spot for cocaine; confidential informants had said that Coleman was involved; Coleman's car was parked in front of Bellfort; the re-appearance of Coleman's car at Bellfort on the

---

[8]U.S. v. Basey, 816 F.2d 980, 988 (5th Cir. 1987).

afternoon of March 8, 1990, corresponded with the appearance of the hitherto unavailable two ounces of cocaine; the undercover officer told Statlander immediately after the sale of cocaine about the man at the bar and Edward's statement about meeting the "other Floyd"; the undercover officer stated that there would be a couple people following her out of the club and that they should be followed; and two black males left the club about that time and drove off in Coleman's car. The government notes, moreover, that Statlander testified that he could not identify the two individuals who got into Coleman's car because of his surveillance position.

We agree with the government's contention that Statlander's request that the marked units stop Coleman's car was based on reasonable suspicion that the car's occupants were involved in illicit activities. The government's explanation for the Terry stop makes consummate sense, i.e, that the officers directing the stop had a relevant investigatory reason to identify the individuals who had just been associated with the sale of cocaine. Although we acknowledge Coleman's point that a stop pursuant to Terry requires that the officers have a particularized suspicion of wrongdoing,[9] Terry does not require that the officers already know the identity of the individual prior to the stop. Indeed, in Adams v. Williams,[10] the Supreme Court expressly stated that "[a] brief stop of a suspicious individual, in order to determine his identity . . . may be [] reasonable in light of the facts known to the

---

[9]See, e.g., U.S. v. Cortez, 449 U.S. 411, 417-18 (1981).

[10]407 U.S. 143, 146 (1972).

9

officer at the time."  We also believe it inappropriate to characterize so narrowly the patrol officers' investigatory purpose as mere "identification" without also considering why identification was desired.  Clearly, this stop was no random detention, "fishing expedition,"[11] or detention based on nothing more than, say, the driver's race or the car's proximity to Bellfort.[12]

C.  SEIZURE OF POUCH

Coleman next argues that even if the stop of his car was valid under Terry, Pedraza's seizure of the pouch from the car's front seat was unlawful.  Coleman contends that the district court erred in crediting Pedraza's testimony--that Pedraza handed the pouch that he knew contained the gun over to Coleman to see what his reaction would be--because that version of events is "beyond belief."  And if his license was not in the car, as the patrol officers contend, but in his sock, Coleman continues, the officers would not have found the gun in the pouch, would not have arrested him for possessing the gun, and therefore could not have searched the car pursuant to that arrest.

The government responds that Coleman's contention ignores a substantial portion of Pedraza's testimony:  Coleman was in a "triangle" position between Smith and Pedraza, so there was no way

---

[11]See, e.g., Basey, 816 F.2d at 989 (Terry rationale does not justify stopping every vehicle for several miles after discovery of crime).

[12]Cf. U.S. v. Buchannon, 878 F.2d 1065, 1067 (8th Cir. 1989) (police justified in stopping cars departing in caravan from suspected drug house).

Coleman could get the gun out of the pouch in time to do either officer any harm; and Pedraza knew that Coleman knew that Pedraza had discovered a gun inside the pouch. Therefore, although Pedraza's approach might seem unreasonably dangerous to those uninitiated with police tactics and procedures, any danger was mitigated by Pedraza's knowledge and position. The government insists, moreover, that "[a]s a patrol officer with seven years experience, Officer Pedraza must be trusted to know what he can and cannot do safely."

As noted earlier, a trial court's factual findings on a motion to suppress must be sustained unless shown to be clearly erroneous.[13] Here, the district court observed the witnesses, weighed conflicting testimony, and made a determination that the patrol officers' version of events was the more credible one. We are not prepared to say in this case that the district court's credibility determinations and its ensuing factual findings were clearly erroneous, and we therefore reject Coleman's assertion of error.

Coleman's more substantial argument is that the district court erred in upholding the seizure of the pouch under the "plain view" doctrine. Despite the district court's ruling, the government wisely characterizes the issue not as a straight plain view seizure but as a Terry frisk of the car for weapons, during which Pedraza discovered the gun in the pouch pursuant to "plain feel." We find, for the reasons that follow, that while Pedraza's seizure of the

---

[13]U.S. v. Logan, 949 F.2d 1370, 1377 (5th Cir. 1991).

pouch from Coleman's car cannot be sustained under the plain view doctrine, it was valid as a <u>Terry</u> frisk of the car for objects that might contain weapons.

As recently summarized by the Supreme Court in <u>Horton v. California</u>,[14] a plain view seizure requires that (1) the police's initial intrusion be supported by a warrant or recognized exception to the warrant requirement,[15] and (2) the incriminating character of the object seized be immediately apparent.[16]  In this case, however, the second element is not satisfied because Coleman's leather pouch was not evidence of crime, contraband, or otherwise inherently incriminating.[17]  Therefore, even had Pedraza seen the pouch prior to entering the car, its seizure would be invalid.

The government's second argument in support of Pedraza's seizure of Coleman's pouch is that it was justified in order to ensure that the pouch contained no weapon.  In <u>Michigan v. Long</u>,[18] the principles articulated in <u>Terry</u> were applied to automobiles. Under <u>Long</u>, "[t]he search of the passenger compartment of an

---

[14]110 S.Ct. 2301 (1990).

[15]<u>Id</u> at 2307.

[16]<u>Id</u>.

[17]<u>See</u> <u>Coolidge v. New Hampshire</u>, 403 U.S. 443, 468 (1971) (cars' probative value remained uncertain until after interiors were swept and examined microscopically).  <u>Compare, e.g.</u>, <u>U.S. v. Webb</u>, 950 F.2d 226, 229 (5th Cir. 1991), reh. denied 1992 U.S. App. LEXIS 2090 (1992), and cert denied 119 L.Ed.2d 236 (1992). (weapons in car in plain view), <u>with</u> <u>Arizona v. Hicks</u>, 480 U.S. 321 (1987) (not apparent that expensive stereo components were contraband).

[18]463 U.S. 1032, 1049-50 (1983).

12

automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on specific and articulable facts which, taken together with the rationale inferences from those facts, reasonably warrant the officer in believing that the suspect is dangerous and the suspect may gain immediate control of the weapon."[19]

The government contends, and we agree, that given the circumstances of this case it was reasonable for the patrol officers to be concerned for their safety. The district court's factual findings reveal that the patrol officers knew that the stop was requested by narcotics officers; indeed, Pedraza knew specifically that the stop was part of an ongoing narcotics investigation or surveillance.[20] Statlander and Ollie clearly had reason to believe that the occupants were involved in narcotics trafficking. When the vehicle was stopped, Coleman did not stay in his car, but exited quickly, meeting Smith at the back of his (Coleman's) car. According to the patrol officers, Coleman appeared nervous when he was interviewed by Smith. The pat-down search of Coleman revealed two bundles of money, thus further associating Coleman with known drug dealing activities at Bellfort.

---

[19]Maryland v. Buie, 494 U.S. 325, 332 (1990) (citations and internal quotations omitted); see also U.S. v. Maestas, 941 F.2d 273, 276 (5th Cir. 1991), cert denied, 116 L.Ed.2d 809 (1992).

[20]Weapons and violence are frequently associated with drug transactions, of course. U.S. v. Wiener, 534 F.2d 15, 18 (2d Cir. 1976) ("[T]o 'substantial dealers in narcotics,' firearms are as much 'tools of the trade' as are most commonly recognized articles of narcotics paraphernalia.").

Hence, the patrol officers had reason to believe that Coleman could be armed and dangerous. So when Coleman stated that his license was in a pouch inside his car and started to retrieve it, Pedraza was justified in retrieving the pouch himself to ensure that it did not contain a weapon.

Having acquired possession of Coleman's pouch through a recognized exception to the warrant requirement--a <u>Terry</u>/<u>Long</u> search of the car for weapons and places that could contain weapons--Pedraza's discovery of the weapon was justified as "plain feel." To determine whether objects in a car contain weapons, the officer conducting the frisk is authorized to touch objects,[21] or even to open those objects.[22] As such, it was perfectly reasonable for Pedraza to pick up the pouch referred to by Coleman to determine if it contained a weapon in addition to Coleman's license.

Coleman was arrested for the crime of carrying a handgun in violation of Texas law. Thus, the officers' second search of Coleman's entire car, in which cocaine and crack were discovered, was valid as a search incident to arrest.[23]

---

[21]<u>See, e.g.</u>, <u>U.S. v. Williams</u>, 822 F.2d 1174 (D.C. Cir 1987) (touch of brown paper bag revealed drugs); <u>U.S. v. Wilkerson</u>, 598 F.2d 621, 625-26 (D.C. Cir. 1978) (pat-down of jacket revealing gun); <u>U.S. v. Portillo</u>, 633 F.2d 1313 (9th Cir. 1980) (contact with paper bag revealed gun).

[22]<u>See, e.g.</u>, <u>U.S. v. Walker</u>, 576 F.2d 253, 255 (9th Cir. 1978) (upholding <u>Terry</u> search of large purse).

[23]<u>See</u> <u>New York v. Belton</u>, 453 U.S. 454 (1981). Because we find that the second search of Coleman's that unearthed the drugs was valid as a search incident to arrest, we need not, and therefore do not, consider the voluntariness of Coleman's consent

14

For the foregoing reasons, therefore, the judgment of the district court is

AFFIRMED.

---

to search.