United States Court of Appeals
Fifth Circuit

**F I L E D**

August 23, 2006

Charles R. Fulbruge III
Clerk

In the

# United States Court of Appeals
## for the Fifth Circuit

m 05-50683

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

TOMMIE DARNELL JENSON,

Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Texas
m 04-CR-190-ALL

Before SMITH and STEWART, Circuit Judges,
and CRANE,[*] District Judge.

JERRY E. SMITH, Circuit Judge:

Tommie Jenson appeals the denial of his motion to suppress evidence as a violation of his Fourth Amendment rights under *Terry v.*

---

[*] District Judge of the Southern District of Texas, sitting by designation.

*Ohio*, 392 U.S. 1 (1968). We reverse and remand for entry of a judgment of acquittal.

### I.

Slightly before 11:00 p.m. on June 4, 2004, DPS Trooper Eric Gray noticed a van traveling east on I-20 at 77 mph where the speed limit was 65 mph. He decided to stop it for speeding, but after putting on his emergency lights Gray stated that it took between thirty seconds and a minute for the van to come to a

complete stop.[1] The officer was driving with a civilian passenger and mentioned to her the suspicion that the passengers in the van may have been trying to conceal something or corroborate stories.

When Gray approached the van, he noticed Jenson, who was the driver, and a woman in the passenger seat and a man in the back seat, both of whom were asleep. Gray informed Jenson he had been stopped for speeding and asked him to step to the rear of the van. Jenson complied and proceeded to answer Gray's questions concerning Jenson's employment and the purpose of his trip. Jenson told Gray that he worked in construction with his uncle Cotton and that they were traveling to Bryan-College Station to pick up his uncle's wife.

Jenson and his passengers provided Gray with drivers' licenses, and Gray ran the licenses to determine whether they were valid and whether there were any outstanding warrants. At 11:02 Gray received word from dispatch that the licenses were clear.

It is uncertain when Gray gave Jenson the written warning, though it probably occurred before Gray asked Jenson's permission to search his vehicle. Gray stated he was "probably close to finishing" the warning at the time he heard from dispatch. He could not recall when he returned the license, though he noted it was his usual practice to return it at the same time he issued the warning.

Though Jenson was calm and cooperative at the time of the initial stop, he became excessively talkative, answering questions that he was not asked, which Gray surmised to mean he was nervous. Jenson continued to exhibit this behavior even after being issued the warning, which Gray found odd because in his experience, a driver normally becomes less agitated when he realizes he is not receiving a citation.

At 11:04 (two minutes after Jenson's license cleared), Gray again asked Jenson where he worked, and he replied "Tommie and Cotton," or "Tommie-Cotton," presumably referring to his construction business with his uncle. Gray then asked Cotton where he worked, and he replied that he was self-employed and that his business did not have a name. Gray found the discrepancy between the two answers suspicious.[2]

Gray then asked for Jenson's permission to search the van, which was granted. There is no indication that Gray, before requesting permission, told Jenson he was free to leave. Gray then told Jenson that he would need to conduct a pat-down search before he could search the vehicle. Gray later testified that it was standard procedure to frisk occupants of a car before proceeding with a search, to ensure the officer's safety while he was otherwise occupied.

Jenson suddenly became upset and complained of harassment. He started emptying his pockets, at which point Gray unholstered his weapon and told Jenson to put his hands

---

[1] The videotape introduced by the government starts in the middle of the traffic stop, but it reveals that Jenson took at least thirty seconds to move to the side of the road and come to a complete stop. For the duration, Jenson was driving in the rightmost lane with his signal on and very little traffic on the road.

[2] Although the government's brief implies that this exchange occurred before Gray checked the licenses, counsel for the government conceded at oral argument that it occurred afterward.

behind his back.

Gray conducted the frisk and found a pocketknife and a small "two-shooter" gun on Jenson's person. Gray put Jenson in his patrol car and ran a criminal background check, which revealed that Jenson was a convicted felon. Jenson was brought to jail, where another officer found a bag of marihuana in his sock.

Jenson filed, and the court denied, a motion to suppress evidence for violation of the Fourth Amendment. He was convicted of one count of being a felon in possession of a firearm and one count of being an unlawful user of a controlled substance in possession of a firearm.

## II.

When reviewing the denial of a motion to suppress, we review findings of fact for clear error and conclusions of law *de novo*. *Ornelas v. United States*, 517 U.S. 690, 699 (1996). We construe all facts in the light most favorable to the government as the prevailing party. *See United States v. Santiago*, 310 F.3d 336, 340 (5th Cir. 2002). We analyze the validity of traffic stops under *Terry*, 392 U.S. at 21, which held that "limited searches and seizures are not unreasonable when there is a reasonable and articulable suspicion that a person has committed a crime." *Santiago*, 310 F.3d at 340. We employ a two-part test to determine whether there was "reasonable suspicion": "whether the officer's action was justified at its inception, and . . . whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc) (citing *Terry*, 392 U.S. at 19-20).

Jenson concedes that his speeding justified the traffic stop at its inception. Therefore, the sole issue on appeal is whether the officer's subsequent actions, including his request to search the vehicle and his pat-down search of Jenson's person, were reasonably related to the circumstances justifying the stop.

Several of Gray's actions are plainly permissible under our caselaw. An officer may ask for a driver's license and registration of the occupants and may run a computer check on both. *See id.* at 509. He also may ask the occupants about their intended destination. *See id.* at 510.

"[W]e reject any notion that a police officer's questioning, even on a subject unrelated to the purpose of the stop, is itself a Fourth Amendment violation . . . . [D]etention, not questioning, is the evil at which *Terry*'s second prong is aimed." *United States v. Shabazz*, 993 F.2d 431, 436 (5th Cir. 1993). We must also be careful, when conducting a *Terry* analysis, to allow "officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Brigham*, 382 F.3d at 507 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)) (internal quotations omitted).

Detention, however, may last no longer than required to effect the purpose of the stop. *See United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (quoting *Brigham*, 382 F.3d at 507). If all computer checks come back clean, then as a general matter reasonable suspicion disappears, and there is no legitimate reason for extending the stop. *See id.* at 431. "A recognized exception to this rule is that if additional reasonable suspicion arises in the course of the stop and before the initial pur-

3

pose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed." *Id.* The government offers three reasons why there was reasonable suspicion to extend Jenson's traffic stop beyond 11:02 (the time the licenses cleared): (1) It took an unusually long time for Jenson's van to pull over, (2) Jenson's excessive talkativeness indicated nervousness, and (3) Jenson and Cotton appeared to give inconsistent answers.

We decline to consider Jenson's and Cotton's contradictory answers, because the alleged inconsistency did not arise until 11:04 and therefore not "before the initial purpose of the stop [had] been fulfilled." *Lopez-Moreno*, 420 F.3d at 431. Even if we did consider the conflicting statements, it would be unreasonable to become suspicious based on the statements made.

When asked about his employment, Jenson replied that he worked for his uncle in construction and that the name of the business was "Tommie-Cotton" or "Tommie and Cotton," presumably combining his and his uncle's names. Cotton, in turn, answered that he was "self-employed," which is not by itself inconsistent with having a nephew as an employee.[3] He also stated that his business did not have a name, but Jenson may have merely given a descriptive title for the two-man operation, instead of a formal name, when pressed. Gray easily could have dispelled his suspicions by asking a follow-up question such as "Do you work with your nephew?," but there is no

evidence that he did so.[4]

Therefore, the specific issue of first impression is whether taking an unusual amount of time to pull over, coupled with nervous behavior by the driver, amounts to reasonable suspicion to justify prolonged detention. We have previously found detentions unreasonable, based on the totality of the circumstances, where the driver exhibited signs of nervousness.[5] It may be that Jenson's signs of nervousness were more probative when coupled with the delay in pulling over. We accord great respect to Gray's testimony, as a trained law enforcement officer, that it was unusual for the van not to brake when the police car activated its emergency lights and that it took an above-average time for Jenson to pull over.

This modest delay in stopping time does not by itself, however, give rise to reasonable suspicion. It may take drivers different amounts of time, especially at night, to identify the lights of the car behind them as coming from a police car and not from another emergency services vehicle. It may also take some time for the driver to recognize that the officer intends for him to stop and safely turn onto the shoulder, as opposed to, for example, taking the next exit so as to be out of the danger of traffic.

---

[3] "Self-employed" is defined as "earning income directly from one's own business, trade, or profession rather than as a specified salary or wages from an employer." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2060 (1986).

[4] *See Florida v. Royer*, 460 U.S. 491, 500 (1983) (explaining that an officer should use "the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time").

[5] *See Santiago*, 310 F.3d at 338 (in which the driver exhibited "extreme nervousness," including shaking hands); *Dortch*, 199 F.3d at 199-200 (in which the driver appeared nervous and "gazed around as if he was looking for a place to run") (internal quotations omitted).

4

We do not mean to say that excessive delay in stopping may never give rise to reasonable suspicion; there may be cases, for example, in which further context, such as erratic driving, acceleration, or passenger movement inside the vehicle further suggest criminal behavior. Here, however, thirty seconds to a minute was a reasonable amount of time for Jenson to respond to the flashing of the emergency lights.

Also, the facts of this case are relatively weak by comparison to the facts in our relevant precedents. For example, in *Jones* there was no reasonable suspicion to search the vehicle even though one of the occupants had a previous arrest on a crack cocaine charge. *See* 234 F.3d at 242.[6] Likewise, in *Santiago* we found a search unreasonable even though the defendant lied to the officer about the identity of a passenger. *See* 310 F.3d at 338-39.

More importantly, the government does not present adequate evidence of a nexus between Jenson's allegedly suspicious behavior and any specific criminal activity. Gray said that while pulling over the vehicle, he thought the passengers might be trying to conceal something or get their explanations straight before stopping. He testified that the three suspicious factors he identified were evidence that "something may be going on in the van that was illegal that they possibly didn't want me to see." When Jenson became visibly agitated after Gray told him he was about to conduct a pat-down search, Gray testified that he thought he had "identified a criminal act." At 11:18, after Gray had searched the vehicle, he told his civilian passenger that when you feel something is illegal, you know it. These gen-

eral statements do not amount to an "*articulable* suspicion that a person has committed or is about to commit a crime," as opposed to a mere hunch. *Royer*, 460 U.S. at 498 (emphasis added).

In contrast, we have found a search reasonable where the officer specifically suspected drug trafficking because the defendant was traveling on a known drug corridor (also I-20), had been arrested for trafficking in the past, did not have a driver's license, and was 500 miles away from the road leading to his alleged destination. *See United States v. Reyes Gonzalez*, 328 F.3d 755, 758 (5th Cir. 2003). In *Santiago*, we found a search unreasonable even though the officer testified that he thought the car might contain narcotics, because the fact that the licenses cleared should have dispelled any suspicion of drug trafficking. *See Santiago*, 310 F.3d at 339, 342; *accord Dortch*, 199 F.3d at 199 (no reasonable or articulable suspicion of drug trafficking).

Likewise, the officer here has not articulated any particular connection between the allegedly suspicious behavior and drug or weapons possession, beyond the fact that the driver's hesitation in pulling over may have been the product of intent to conceal. In short, the government has not shown reasonable suspicion to prolong Jenson's traffic stop.[7]

---

[6] *See also Dortch*, 199 F.3d at 196, 199 (finding that defendant's criminal record did not give rise to reasonable suspicion).

[7] Nor does it affect our analysis that only four minutes elapsed between the ID clearance and Jenson's consent to the search. The government argues that the officer's actions were a natural progression and a reasonable extension of the initial stop. In *Dortch*, however, we found a *Terry* violation even though it took "five minutes or less" between the ID clearance and the arrival of a K-9 unit to search defendant's car. *Dortch*, 199 F.3d at (continued...)

## III.

The government contends that, even if the officer unreasonably extended the traffic stop beyond the point at which the van's occupants' ID's were cleared, Jenson's consent to search cured any Fourth Amendment problem. "Consent to search may, but does not necessarily, dissipate the taint of a fourth amendment violation." *United States v. Chavez-Villarreal*, 3 F.3d 124, 127 (5th Cir. 1993).[8] To determine whether consent was validly given, we ask (1) whether consent was voluntary and (2) whether it was an independent act of free will. *See Santiago*, 310 F.3d at 342 (citing *Chavez-Villarreal*, 3 F.3d at 127).

We use a multi-factor test to determine whether consent was voluntary, in which we consider

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

*Jones*, 234 F.3d at 242 (citing *Shabazz*, 993 F.2d at 438). The government bears the burden of proving that consent was voluntary. *See id.* We review a finding of voluntariness for clear error. *See Shabazz*, 993 F.2d at 438.

The district court found that consent was voluntary because Gray did not request consent until after the stop was completed and the warning issued, and Jenson was at all times cooperative and seemed to understand and be able to communicate with the trooper. The court noted, however, that Jenson would have been aware of the incriminating evidence on his person, though none was found in the vehicle.[9] Because the question is close, we conclude the court did not commit clear error.

Even assuming, however, that the court correctly concluded that consent was voluntary, it committed error by not applying the second prong of the test: whether consent was an independent act of free will.[10] The purpose

---

[7](...continued) 203 (Garwood, J., dissenting). It is not the duration of time, but the quantity of evidence, that determines whether reasonable suspicion survives the officer's background check. In this case, there was insufficient reason for suspicion to continue once Jenson's ID cleared; a constitutional violation occurred the *moment* the detention continued past that point.

[8] *See also Brigham*, 382 F.3d at 508 (stating that "a consensual interrogation may follow the end of a valid traffic stop").

[9] Also, as previously noted, the government did not present evidence that Jenson's license had been returned to him before consent was requested and did not prove that Jenson had been informed he was free to go. Given the burden of proof, we draw an adverse inference against the government on these facts. *See Santiago*, 310 F.3d at 343 n.4.

[10] *See Jones*, 234 F.3d at 243 (opining that even assuming that consent was voluntary, "it is clear that the government failed to prove that the consent was an independent act of free will and that the district court erred by not considering the second prong of the consent inquiry, which is required when a constitutional violation has preceded the consent"); *Dortch*, 199 F.3d at 202 ("[E]ven if [defendant's] consent was voluntarily given, and the district court's determination therefore was not clearly erroneous, the consent was not valid. (continued...)

of this inquiry is to determine whether there was a "break in the causal chain" between the constitutional violation and the consent; that is to say, consent cannot be the product of the illegal detention. *See Santiago*, 310 F.3d at 343.

To determine whether consent was independent, we consider "1) the temporal proximity of the illegal conduct and the consent; 2) the presence of intervening circumstances; and 3) the purpose and flagrancy of the initial misconduct." *Jones*, 234 F.3d at 243. Though the initial officer misconduct was not flagrant, the first two factors cut decidedly against the government.

The consent followed closely on the heels of the illegal detention, and there is no evidence that (a) Jenson knew he was free to leave or (b) that his license had been returned to him, both of which might be viewed as intervening circumstances.[11] In *Jones* we found the causal chain had not been broken where the officers "appeared to knowingly prolong the detention" by purposely failing to return one of the passenger's ID's. *Id.* We give the same legal effect today to the failure of the government to meet its burden of proving that Jenson's consent was independently given.

_____

[10](...continued)
Instead, because the causal chain between the illegal detention and Dortch's consent to a third body search was not broken, the search was nonconsensual.").

[11] *But see Dortch*, 199 F.3d at 196, 198 (deciding that statement that defendant was free to leave was ineffectual where police detained vehicle and license, and defendant driver "could not reasonably be expected to wander off down the highway in an unfamiliar area").

We note also that the evidence was ultimately discovered on Jenson's person, pursuant to a pat-down search, not in the vehicle that Jenson gave Gray permission to inspect. It is without question that Jenson did not consent to the pat-down search, but limited pat-down searches are permissible "for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Terry*, 392 U.S. at 27.[12]

There is no *Terry* violation "if the searching officer can point to specific and articulable facts suggesting actual physical risk to himself or others." *Sink*, 586 F.2d at 1048. When Gray informed Jenson he would conduct a pat-down search, Jenson became upset, complained of harassment, and began emptying his pockets. Although we do not question Gray's decision to conduct a frisk in response to such nervous behavior, the suspicious conduct occurred only *after* reasonable suspicion to continue the detention had been dispelled and Gray had obtained involuntary consent to search the vehicle.

Under the fruit of the poisonous tree doctrine, "all evidence derived from the . . . illegal search . . . must be suppressed, unless the government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the constitutional violation." *Dortch*, 199 F.3d at 200-01. The police would not have discovered either Jenson's gun or marihuana but for the search of his person, and the police would not have searched his person had they not il-

_____

[12] *See also United States v. Sink*, 586 F.2d 1041, 1047-48 (5th Cir. 1978).

legally extended the stop beyond the time when reasonable suspicion expired. Therefore, the evidence is fruit of the poisonous tree and must be suppressed.[13]

## IV.

The government cites *Brigham* to support its argument, but on close inspection it does not apply to these facts. There we found that the police had reasonable suspicion to search defendant's vehicle where the defendant driver (1) was not the lessee of the vehicle, (2) the lessee of the vehicle was not in the car, and (3) the driver's and passenger's versions of their itinerary differed. *Brigham*, 382 F.3d at 508. It was critical to the holding in *Brigham* that one of the car's occupants had provided the police with a fictitious ID and therefore, had not been cleared by the officers' computerized search when consent was given. *See id.* at 510. We noted that cases such as *Dortch* and *Jones* "are about timing and sequence: After the computer checks came up 'clean,' there remained no reasonable suspicion of wrongdoing by the vehicle's occupants." *Id.* at 510.

In *Brigham*, because the police obtained consent to search defendant's vehicle while the background check was pending, the detention continued to be justified by the facts that gave rise to its inception, so no Fourth Amendment violation occurred. *See id.* at 509 (quoting *Shabazz*, 993 F.2d at 437). *A fortiori*, because

there was no *Terry* violation, there was no need to inquire whether consent was constitutionally tainted. *See id.* at 512. Here, however, the request to search occurred after defendant's license cleared, and as instructed by *Dortch*, *Jones*, and *Santiago*, there was no reasonable suspicion to justify prolonging the search, nor was the consent given independently of the illegal detention.[14]

The conviction is REVERSED, and this matter is REMANDED for entry of a judgment of acquittal.

---

[13] Jenson's initial motion to suppress was inartful: He listed only the weapon, not the marihuana, as the evidence he sought to exclude from trial. The fruit of the poisonous tree doctrine, however, requires us to suppress *all* evidence acquired as the result of an illegal search, and the government does not argue that Jenson has waived his right to request suppression of the drugs.

[14] Some language in *Brigham* suggests that it does not matter in what sequence the police ask for consent to search the vehicle and conduct the background ID search. *See Brigham*, 382 F.3d at 511 ("There is . . . no constitutional stopwatch on traffic stops."); *id.* (stating that ID searches "need not be pursued to the exclusion of, or in particular sequence with, other efficient means."). As quoted above, however, we put particular emphasis on the fact that defendants' ID's had not yet cleared, and we explicitly stated that the government had not asked the en banc court to reconsider *Dortch*, *Jones*, or *Santiago*. *See id.* at 510 n.10. The best understanding of *Brigham* is to treat as decisive the fact that, in that case, one passenger presented the police with a fake license, which (a) heightened suspicion about the passenger's activities and (b) necessarily extended the time required to identify and clear the vehicle's occupants.