# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 24, 2008

Charles R. Fulbruge III
Clerk

No. 07-30047

UNITED STATES OF AMERICA

Plaintiff-Appellant

v.

RONALD THIBODEAUX

Defendant-Appellee

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:06-CR-49

Before WIENER, DeMOSS, and PRADO, Circuit Judges.

PER CURIAM:[*]

During a traffic stop, Baton Rouge City Police Officer Chris Fischer ("Fischer") found a semi-automatic handgun in the car of Defendant-Appellee Ronald Thibodeaux ("Thibodeaux"), and the United States (the "Government") charged Thibodeaux with unlawful possession of a firearm. The district court granted Thibodeaux's motion to suppress the weapon based on its finding that Fischer illegally prolonged the traffic stop, and the Government appeals. For the following reasons, we AFFIRM the ruling of the district court.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On October 1, 2005, at approximately 6:00 a.m., Fischer was traveling on Interstate 10 in Louisiana when he observed a Chrysler PT Cruiser ("the Cruiser") in the lane next to him. Suddenly and without warning, the driver of the Cruiser, Thibodeaux, attempted to change into Fischer's lane of travel without signaling, and the Cruiser almost collided with Fischer's police vehicle. To avoid a collision, Fischer hit his brakes heavily and momentarily sounded his siren. Thibodeaux did not apply his brakes or adjust his driving. To stop the Cruiser, Fischer pulled behind it, activated the strobe lights on his police vehicle, and sounded his siren. Fischer testified that he intended "basically to find out what was going on, that [Thibodeaux] was okay, and to find out why he decided to get over like that." Thibodeaux proceeded past one exit on the interstate before exiting at the next one; he then drove to the next major intersection and made one turn before stopping. Fischer estimated that the Cruiser traveled almost a mile before it stopped. Fischer stopped his police vehicle approximately twenty feet behind the Cruiser.

Once the Cruiser stopped, Fischer used his public address system to ask Thibodeaux to step out of the vehicle; Thibodeaux did so, leaving his car door open. Fischer then asked Thibodeaux to come over to the police vehicle; Thibodeaux hesitated, then did so. Upon Fischer's request, Thibodeaux presented a valid driver's license. When Fischer questioned him about his driving, Thibodeaux told Fischer that he had been falling asleep at the wheel. Fischer testified that he had no reason to disbelieve this explanation. Fischer also stated that he noticed nothing in Thibodeaux's behavior that would suggest he was under the influence of alcohol or drugs. Fischer testified that during this conversation, Thibodeaux "started backing up towards [his] vehicle . . . so I asked him to just come on back to me . . . and that went back and forth a few

times." He said, "a couple of times I had to approach him to stop him from gaining reentry to the vehicle and the whole time he was very jittery." Fischer testified that "there are certain behaviors that kind of stick out. And he started producing that behavior. It was more of a flight-type behavior. I mean, you could see it in his eyes that he didn't want anything to do with me." Fischer testified that he "wasn't sure if Thibodeaux was trying to get back to the vehicle to either flee in the vehicle or to gain access to a weapon." However, he also stated that Thibodeaux "was not showing any active aggression." At one point, Fischer placed himself between Thibodeaux and the vehicle and asked Thibodeaux to step back to the police vehicle, which Thibodeaux did.

Fischer then asked Thibodeaux to sit in the back of the police vehicle. Fischer testified that he wanted to "make sure [Thibodeaux] had no weapons on his person and to get him in my vehicle to find out why he was so scared." When Fischer asked Thibodeaux to sit in the police car, Fischer testified that Thibodeaux "kind of became emotional." Fischer stated that Thibodeaux fell on the ground and sat down, saying, "'I'm not getting in the car. I'm not getting in the car.'" Fischer insisted that Thibodeaux get into the vehicle; Thibodeaux eventually did, and Fischer closed the door behind him. Fischer stated that when Thibodeaux entered the police vehicle, "no criminal offense was evident at that time, but in my experience, when you have somebody react like that, they either have some type of warrant, or there is something in the vehicle that they are not supposed to have." Fischer testified that at that point he intended to look into the Cruiser and "to ensure that [Thibodeaux] did not have any warrants." Before beginning to run a check for warrants, Fischer approached the Cruiser and shined his flashlight through its open door. He observed a semi-automatic handgun lying on the driver's seat with the handle and side of the weapon viewable from the open car door. Fischer then returned to his police vehicle and initiated a computer check for warrants and prior convictions; he

discovered that Thibodeaux had five prior convictions for armed robbery and was on probation until 2011. Fischer then placed Thibodeaux under arrest for being a felon in possession of a firearm.

Thibodeaux was charged with possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). He filed a motion to suppress the evidence of the weapon seized from the car, which the district court granted. The district court found that an illegal seizure occurred when Fischer detained Thibodeaux in the police car for reasons other than confirming or dispelling the suspicion that justified the initial stop or addressing reasonable suspicion that arose during the stop. It found that Thibodeaux's delay in stopping was reasonable, given that it was dark and they were on the interstate. The court also expressed doubt that Fischer was concerned for his safety, because Fischer failed to testify that he felt endangered, did not do a pat-down of Thibodeaux, and did not call for backup. The district court concluded that Fischer merely had a hunch, not supported by reasonable suspicion, that Thibodeaux was hiding something, and that detaining Thibodeaux to investigate that hunch was an illegal seizure. The district court denied the Government's motion for reconsideration, reiterating its conclusion that it was unable to identify any articulable facts that would give any officer reasonable suspicion.[1] The Government appeals, and this court has jurisdiction under 18 U.S.C. § 3731.

## II. DISCUSSION

When considering an appeal of a grant of a motion to suppress, we review the district court's factual determinations for clear error and its ultimate Fourth Amendment conclusions de novo. United States v. Gonzalez, 328 F.3d 755, 758 (5th Cir. 2003) (citing Ornelas v. United States, 517 U.S. 690, 699 (1996)). The

---

[1] The district court also rejected the Government's argument that the weapon should be admitted under the inevitable discovery doctrine, but the Government does not renew that argument on appeal.

Fourth Amendment guarantees individuals the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. The stopping of a vehicle and the detention of its occupants constitutes a "seizure" under the Fourth Amendment. United States v. Brigham, 382 F.3d 500, 506 (5th Cir. 2004) (en banc). In evaluating the constitutionality of traffic detentions, whether they are justified by probable cause or reasonable suspicion of a violation, we use the standard for investigative detention announced in Terry v. Ohio, 392 U.S. 1 (1968). Brigham, 382 F.3d at 506. Under this approach, "the legality of police investigatory stops is tested in two parts. Courts first examine whether the officer's action was justified at its inception, and then inquire whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." Id. at 506 (citing Terry, 392 U.S. at 19-20).

"Once the purpose of a valid traffic stop has been completed and an officer's initial suspicions have been verified or dispelled, the detention must end unless there is additional reasonable suspicion supported by articulable facts." United States v. Estrada, 459 F.3d 627, 631 (5th Cir. 2006). Also, an investigative traffic detention "may last no longer than required to effect the purpose of the stop." United States v. Jenson, 462 F.3d 399, 404 (5th Cir. 2006). In assessing whether a detention has lasted longer than necessary, we examine "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." United States v. Sharpe, 470 U.S. 675, 686 (1985).

Thibodeaux concedes that the initial traffic stop itself was lawful. Therefore, in light of this framework, we must examine whether Fischer found the weapon while effectuating the initial purpose of the stop or whether there was reasonable suspicion to justify extending the stop beyond its initial purpose, and whether Fischer's actions unreasonably prolonged the stop.

1. **Whether Fischer's actions were within the scope of the initial traffic stop**

In Brigham, we noted that certain police activities are "within the scope of investigation attendant to the traffic stop." 382 F.3d at 507-08. These activities include requesting documents such as driver's licenses, registrations, or rental papers; running a computer check on those documents; and asking questions about the purpose and itinerary of a driver's trip. Id. We noted that "[s]uch questions may efficiently determine whether a traffic violation has taken place, and if so, whether a citation or warning should be issued or an arrest made." Id. at 508. We held that these activities need not occur in a particular order, rejecting a per se rule that it is unreasonable for an officer to conduct preliminary questioning before initiating computer checks. Id. at 511. We emphasized that "[d]etention, not questioning, is the evil at which Terry's second prong is aimed," stating that "[m]ere police questioning, without some nonconsensual restraint on one's liberty, is not a 'seizure' or detention." Id. at 508 (citations omitted). Although additional reasonable suspicion arose to justify extending the stop at issue in Brigham, we noted in dicta that at least some of these activities would be permissible even in the absence of additional suspicion. See id. at 509 (stating that during a traffic stop for following too closely, computer checks begun after several minutes of questioning "would have been permissible even without the additional information [the officer] had gleaned, which led to a reasonable suspicion that . . . the vehicle might have been stolen").

Under Brigham, Fischer was clearly effectuating the initial purpose of the stop when he questioned Thibodeaux and requested his driver's license before initiating a warrants check. However, when Fischer secured Thibodeaux in the back of the police vehicle while he walked over to Thibodeaux's car to investigate what was inside, he engaged in activities not among those the Brigham court described as being within the scope of the initial purpose of a traffic stop. In

addition, holding someone in the back of a police car represents a far more significant restraint on liberty than mere questioning or requesting documents. Also, in contrast to Brigham, in which the court noted that the officer's preliminary questioning process before the warrants check "required as long as it did for reasons beyond [the officer's] control"—inconsistencies and evasive answers from the driver and passengers that required more questioning for resolution, id. at 510, here the decision to extend the detention by investigating the Cruiser before beginning a warrants check was entirely within Fischer's control. Finally, we note that although Fischer could have approached the Cruiser initially, the reason he could have done so was to confirm or dispel his initial suspicions about Thibodeaux's erratic driving. See Sharpe, 470 U.S. at 686. The Government does not explain how Fischer's examination of the Cruiser when Thibodeaux was in the back of the police car could possibly have addressed those suspicions, nor would such an argument be consistent with Fischer's testimony that he had no reason to disbelieve Fischer's explanation for his erratic driving. Therefore, Fischer was not effectuating the initial purpose of the stop when he examined the Cruiser and found the weapon.

2. Whether Fischer's actions were supported by reasonable suspicion that arose during the traffic stop

A detention may continue beyond the time necessary to effectuate the initial stop if additional reasonable suspicion arises after the initiation of the stop to justify extending it and the officer's actions are "reasonably related . . . to dispelling his reasonable suspicion developed during the stop." Brigham, 382 F.3d at 507. Reasonable suspicion must be based on "'specific and articulable facts,' not merely 'inarticulate hunches' of wrongdoing." United States v. Ibarra-Sanchez, 199 F.3d 753, 758 (5th Cir. 1999) (quoting Terry, 392 U.S. at 21). We must "look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal

wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002) (internal quotation marks omitted).

The Government argues that several facts gave rise to independent reasonable suspicion that justified Fischer's actions in this case: (1) Thibodeaux took a significant amount of time to pull over, (2) Thibodeaux left his car door open when he went to meet Fischer, (3) Thibodeaux was hesitant to go to Fischer when asked to do so and made repeated attempts to go back to his car, (4) Fischer placed himself between Thibodeaux and Thibodeaux's car to prevent Thibodeaux from gaining reentry to the vehicle, (5) Thibodeaux appeared "jittery," and (6) Thibodeaux became emotional, collapsed on the ground, and initially refused to comply with the officer's request to sit in the back of the car. The Government argues that given these facts, a reasonable police officer could have believed that the defendant was likely to flee or to have a weapon in his car and could have been concerned for his safety.

We first consider the Government's contentions that there were sufficient facts to support a reasonable suspicion that Thibodeaux had a weapon in his car and that there was a risk to officer safety. The Government cites several cases in support of its argument that such reasonable suspicion existed.[2] For example, in Michigan v. Long, 463 U.S. 1032, 1035 (1983), officers stopped to investigate a car that had swerved into a ditch. The driver appeared intoxicated and failed to respond to the officers' repeated requests for a driver's license and vehicle registration. Id. at 1036. While being questioned outside the car, the driver moved toward his open car door, and the officers followed him, where they observed a large hunting knife through the door of his car. Id. The Supreme Court held that a subsequent protective search of the car was justified based on

---

[2] We note that these cases address whether a concern for officer safety justified a warrantless protective search of the car. Here, there was no search, just an extended seizure. Nonetheless, these cases provide some guidance as to the sorts of articulable facts that trigger a reasonable suspicion of concern for officer safety.

the officers' reasonable belief that the driver posed a danger because of the late hour, the rural area, the apparent intoxication, and the presence of a large knife in the car that the driver was about to reenter. Id. at 1050. See also United States v. Wallen, 388 F.3d 161, 162-66 (5th Cir. 2004) (holding that where an officer conducting a traffic stop immediately observed several handguns in the car, the driver disobeyed the officer's instructions, and the officer discovered an outstanding arrest warrant, the officer had "encountered facts that would objectively cause him reasonably to suspect that there were other weapons in the vehicle and to worry about his safety," thereby justifying a search of the car); United States v. Coleman, 969 F.2d 126, 128-32 (5th Cir. 1992) (holding that where officers stopped a driver as part of an ongoing narcotics investigation, the driver appeared nervous, a pat-down revealed two bundles of money, and the driver reached into his car to pick up an item from under the armrest in the car, the officers were justified in stopping him and seizing the item themselves based on a concern for officer safety).

We find these cases inapposite and do not find sufficient facts here to support an officer reasonably suspecting that his safety was in danger or that Thibodeaux was harboring a weapon in his car. In contrast to the cases the Government cites, here Fischer had no evidence that Thibodeaux had weapons, was engaged in criminal activity, or was acting in a threatening manner when he decided to prolong the traffic stop. In Long and Wallen, the officers had already observed weapons in the suspects' cars before performing the challenged actions, a major factor that would cause a reasonable officer to believe his safety was in danger. Here, in contrast, Fischer had observed no weapons at the time he decided to detain Thibodeaux in the police car. Similarly, in Coleman, the officers already knew that the occupants of the car were subjects of a narcotics investigation, and the officers had found bundles of money on the occupants, further connecting them with serious crimes. Here, Fischer had no evidence that

Thibodeaux was involved in any illegal activity more serious than a traffic violation, which weakens any suspicion that Thibodeaux was armed. The facts Fischer did observe—that Thibodeaux was jittery, emotional, did not want to sit in the police car, moved toward his own car, and left his car door open—suggest that Thibodeaux was nervous and wanted the traffic stop to be over. However, they do not suggest that Thibodeaux had a weapon in his car or could be a danger to the officer. This is particularly true given Fischer's testimony that Thibodeaux was "not showing any active aggression." See Estep v. Dallas County, 310 F.3d 353, 360 n.6 (5th Cir. 2002) (citing past cases where we have upheld warrantless searches based on a contention that the officer feared for his safety and noting that in those cases, "the individuals in question aroused suspicion because they were either intoxicated, already suspects of violent crimes, had made threatening statements, or had in plain view some evidence of a concealed weapon").

Next, we consider whether there were sufficient facts to support reasonable suspicion of any other criminal activity. The Government contends that this case is similar to Brigham, 382 F.3d 500, in which this court found reasonable suspicion to support extension of a traffic stop; Thibodeaux contends that it is more similar to Jenson, 462 F.3d 399, in which we did not.

In Brigham, during a traffic stop, the driver produced a rental agreement describing the car's lessee as a fifty-year-old female. 382 F.3d at 504. Because none of the car's occupants were fifty-year-old females, the officer became suspicious that the car might have been stolen and began questioning the occupants about where they had been and what their plans were. Id. The driver appeared nervous and responded to the officer's questions with questions of his own. Id. In addition, the passengers' stories were not completely consistent with the driver's answers. Id. After about eight minutes of questioning, the officer initiated computer checks on the car and the occupants' identification

cards. Id. at 505. Even after the checks revealed that the car had not been reported stolen, he continued the stop to wait for the identification checks. Id. After the results suggested that one occupant had produced false identification, the officer continued the stop to learn the passenger's true identity. Id. While the final identification check was pending, the officer conducted a consensual search of the vehicle and found drugs. Id. We held that the detention as a whole was reasonable. Id. at 509. We found that the discrepancy between the listed lessee and the occupants of the car, the driver's nervousness, and the occupants' inconsistent stories led to a reasonable suspicion that the vehicle might have been stolen. Id. We also held it was reasonable for the officer to wait for the identification checks to be completed even after he learned that the car had not been reported stolen, noting that the officer's experience had shown him that the fact that a vehicle had not yet been reported stolen did not mean that it had not actually been stolen. Id. We rejected the argument that the stop was unconstitutionally extended merely because the officer conducted questioning before initiating computer checks, noting that the preliminary questioning "required as long as it did for reasons beyond [the officer's] control"—the inconsistent and evasive answers given by the car's occupants—and that there is "no constitutional stopwatch on traffic stops." Id. at 510-11.

In Jenson, an officer put on his emergency lights to stop Jenson's van for speeding, and the van took up to a minute to stop. 462 F.3d at 402. The officer approached the van and asked Jenson questions about his employment and the purpose of his trip. Id. Although Jenson was initially calm and cooperative, he became excessively talkative and answered questions he was not asked. Id. After Jenson's computer check came back clean, the officer continued asking questions, eventually leading to the discovery of weapons and drugs. Id. at 403. The court held that no reasonable suspicion had arisen before the computer

check came back clean to justify detaining Jenson beyond that point. Id. at 404-05. It stated that signs of nervousness, combined with a modest delay in pulling over, are not sufficient to give rise to reasonable suspicion. Id. at 405. It noted that "[i]t may take drivers different amounts of time, especially at night, to identify the lights of the car behind them as coming from a police car and not from another emergency services vehicle." Id. The court also stated,

> More importantly, the government does not present adequate evidence of a nexus between Jenson's allegedly suspicious behavior and any specific criminal activity. [The officer] said that while pulling over the vehicle, he thought the passengers might be trying to conceal something or get their explanations straight before stopping. He testified that the three suspicious factors he identified were evidence that "something may be going on in the van that was illegal that they possibly didn't want me to see." When Jenson became visibly agitated after [the officer] told him he was about to conduct a pat-down search, [the officer] testified that he thought he had "identified a criminal act." At 11:18, after [the officer] had searched the vehicle, he told his civilian passenger that when you feel something is illegal, you know it. These general statements do not amount to an "articulable suspicion that a person has committed or is about to commit a crime," as opposed to a mere hunch.

Id. (quoting Florida v. Royer, 460 U.S. 491, 498 (1983)).

We find that, as in Jenson and in contrast to Brigham, the Government has failed to present adequate evidence of a link between Thibodeaux's behavior and any specific criminal activity. In Brigham, there was a clear nexus between the facts the officer observed and specific suspected criminal activity: the driver was not listed on the rental agreement, which, in combination with the driver's nervousness and the inconsistencies between his story and those of his passengers, led the officer to suspect that the car was stolen. In Jenson, in contrast, the court found that generally nervous behavior suggesting that a driver "might be trying to conceal something" did not create reasonable suspicion because there was no nexus between the allegedly suspicious behavior and any

specific criminal activity. Here, Thibodeaux's behavior was similar to Jenson's—he delayed pulling over and appeared nervous while being questioned. He did exhibit some more possibly suspicious behavior than did Jenson: he initially hesitated before coming over to the police car, he initially refused to sit in the police car before complying, and he became emotional and sat down in the middle of the road. Also, during questioning, Thibodeaux "kept backing up." However, although there was more nervous behavior here than in Jenson, the behavior is like that in Jenson in that it does not suggest any particular criminal activity. Fischer testified that he believed Thibodeaux "just wanted to get out of there" and might "either have some type of warrant [or] something in the vehicle that [he was] not supposed to have." These vague statements are very similar to those of the officer in Jenson, who suspected that "something may be going on in the van that was illegal that they possibly didn't want me to see." We find that these facts "do not amount to an 'articulable suspicion that a person has committed or is about to commit a crime,' as opposed to a mere hunch." See Jenson, 462 F.3d at 405.

We acknowledge that Thibodeaux's backing away from the officer toward his car was somewhat suggestive of an intent to flee the scene. However, even assuming, arguendo, that Fischer had reasonable suspicion that Thibodeaux might flee the scene, Fischer's subsequent actions were unreasonable. During a traffic stop, an officer must pursue a course of action that is likely to address his suspicions quickly. Sharpe, 470 U.S. at 686. The course of action "must be reasonably related . . . to dispelling his reasonable suspicion developed during the stop." Brigham, 382 F.3d at 507. If Fischer's only reasonable suspicion was that Thibodeaux might flee, we do not see how inspecting the contents of Thibodeaux's Cruiser while keeping Thibodeaux detained in the back of the police vehicle was a course of action that would have addressed that suspicion. Once Thibodeaux was detained in the police vehicle, flight was no longer a

possibility. Thus, Fischer's decision to keep him detained there, extending the length of the stop, while Fischer conducted activities unrelated to any reasonable suspicion developed during the stop, was unreasonable, and the stop was illegally extended.

Because Fischer found the weapon during an illegally extended traffic stop, the weapon must be suppressed. "Under the fruit of the poisonous tree doctrine, all evidence derived from the exploitation of an illegal seizure must be suppressed, unless the government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the Fourth Amendment violation." United States v. Portillo-Aguirre, 311 F.3d 647, 658 (5th Cir. 2002). We have consistently relied on this doctrine to suppress evidence found during illegally extended traffic stops. See Jenson, 462 F.3d at 408 (holding that where "[t]he police would not have discovered [the evidence] but for the search of his person, and the police would not have searched his person had they not illegally extended the stop beyond the time when reasonable suspicion expired," the evidence had to be suppressed under the fruit of the poisonous tree doctrine); United States v. Jones, 234 F.3d 234, 243-44 (5th Cir. 2000); United States v. Dortch, 199 F.3d 193, 200-01 (5th Cir. 1999).

Here, the weapon was the "fruit" of the detention: as in Jenson, Fischer would not have discovered the gun but for the fact that Fischer continued the stop. Had Thibodeaux been allowed to leave, his car would not have been stopped, open and unattended, when Fischer inspected it. Moreover, there is nothing in the record or in the Government's briefs to suggest that there was an intervening circumstance that might have broken the chain of causation and attenuated the connection between the allegedly illegal seizure and the discovery of the weapon, such as an independent and voluntary consent.

We reject the Government's contention that the district court erred in granting the motion to suppress without addressing whether Fischer's

examination of Thibodeaux's car constituted a "search" within the meaning of the Fourth Amendment. Whether there was a search, illegal or otherwise, is irrelevant to this appeal. The district court rested its judgment, as do we, on a finding that Fischer performed an illegal seizure when he prolonged the traffic stop to secure Thibodeaux in the police vehicle and inspect Thibodeaux's car. The weapon was the fruit of that seizure. Where evidence is found as a result of an illegal seizure, it must be suppressed even where it was not found as the result of an illegal search. See Dortch, 199 F.3d at 200-01 (holding that when drugs were found during a car search supported by probable cause, but the probable cause arose because of an illegally extended traffic stop, the drugs were discovered in violation of the Fourth Amendment); United States v. Tookes, 633 F.2d 712, 714-16 (5th Cir. 1980) (holding that where an officer chased a suspect and arrested him without probable cause, then looked for evidence in the area where the chase had occurred and observed a gun in plain view in the suspect's truck, the gun had to be suppressed as a product of the illegal arrest despite the fact that the gun was in plain view and conceivably could have been discovered in the absence of the arrest).

In sum, we agree with the district court that Fischer did not find the weapon while effectuating the initial purposes of the stop or while addressing reasonable suspicion developed during the course of the stop. We find that Fischer was aware only of facts sufficient to support a hunch that Thibodeaux was hiding something, rather than particularized reasonable suspicion of criminal wrongdoing. Thus, the stop was unreasonably extended, and the weapon must be suppressed as the fruit of an illegally extended traffic stop.

AFFIRMED.